[No. S004721. Crim. No. 25590. July 11, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTHONY JOHN SULLY, Defendant and Appellant.

COUNSEL

J. Courtney Shevelson, under appointment by the Supreme Court, and Renee L. Berenson for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Morris Beatus and Herbert F. Wilkinson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

LUCAS, C. J.—Defendant appeals from his capital sentence following conviction of six counts of first degree murder (Pen. Code, § 187; all statutory references are to this code unless otherwise stated) with a special circumstance of multiple murder (§ 190.2, subd. (a)(3)). Finding no reversible error, we affirm the conviction and sentence.

### FACTS AND PROCEEDINGS

*Summary*

Defendant killed five women and one man in bizarre episodes involving prostitution and cocaine use. Although he denied committing any of the murders, extensive circumstantial and physical evidence, as well as accomplice testimony, supported his conviction on each count. At the penalty phase, the prosecution presented evidence of defendant's threats to kill his estranged wife and her daughter. Rejecting defendant's testimony (which denied all charges), the jury convicted him on all counts, made the requested multiple-murder special-circumstance finding, and fixed the penalty at death.

*The Guilt Phase*

Defendant served for nearly eight years as a police officer for the City of Millbrae, where he was trained in fingerprint detection and other law enforcement techniques. On leaving police service, he established a successful electrical contracting business, eventually located in a warehouse in Burlingame. He converted the front of the warehouse to his personal residence. Before the crimes at issue here, defendant invested several thousand dollars as a coventurer in an "escort service" and regularly used prostitutes'

services. He freebased cocaine and had sex with prostitutes at the warehouse, subjecting the prostitutes to rape, beatings, and other forms of violence.

### 1. *Gloria Fravel*

Defendant met Tina Livingston in 1982 when she was a partner in an escort service. Gloria Fravel worked as a prostitute for Tina Livingston. She also owed Livingston $500, having incurred charges in that amount on Livingston's credit card. Fravel was picked up by Livingston and Angel Burns, another prostitute, in San Francisco on a Friday afternoon and transported to defendant's warehouse, ostensibly to obtain some camping equipment from defendant. When the three arrived at the warehouse, defendant asked Fravel for a date. When she declined, he slapped her across the face and directed her to go to the back of the warehouse.

Defendant kept Fravel in the back of the warehouse during the weekend, while Burns and Livingston remained out front. He gagged and handcuffed her and suspended her from the ceiling. He assured Livingston that Fravel would repay the amount she owed. After having sex with Fravel, defendant allowed her to dress, telling her she would be permitted to go home. He later revoked the permission and gagged and bound Fravel, placing her on the bed.

Defendant sat on a chair next to the bed and fashioned a hangman's noose from a piece of rope. He freebased cocaine, then brutally sodomized Fravel. At some point, Fravel's gag fell off and she began screaming. Livingston and Burns attempted unsuccessfully to replace the gag and to silence Fravel by tightening the hangman's noose around her neck. Defendant intervened. While Burns held a pillow over Fravel's head, defendant put his foot against the back of her neck, and jerked hard on the hangman's noose. After several tugs, Fravel's body went limp and her bodily fluids spilled out.

With the assistance of Burns and Livingston, defendant encased Fravel's body in plastic and moved it into a car. Burns and defendant drove away to dispose of the body; Livingston cleaned up the warehouse. When Burns and defendant returned several hours later, Burns was covered with blood. Burns reported to Livingston that she had continued to choke Fravel, who was not yet dead when her body was removed from the warehouse. Defendant added that he had pulled the van to the side of the road and hit Fravel with a hatchet. He said that she "bled all over everything." According to defendant, he and Burns then dumped Fravel's body on Skyline Drive, where it was later discovered.

Post mortem examination revealed ligature marks on Fravel's ankles and neck. Her mouth was open, but her teeth were tightly clenched. She also suffered numerous irregularly shaped and sized penetrating injuries, including one below the right ear which transsected the jugular vein. Fravel died of severe head and neck injuries due to combined cuts and blunt trauma.

Defendant later read to Livingston a newspaper clipping about the discovery of Fravel's body. The story related that a butcher had found the body, a fact defendant found humorously appropriate.

2. *The Golden Gate Park Barrel Murders: Brenda Oakden, Michael Thomas, and Phyllis Melendrez*

Shortly after the murder of Gloria Fravel, defendant told Livingston he wanted to take a completely new girl (i.e., one that had not previously had professional sex) and kill her before anyone else "had" her. Livingston later called defendant and told him about Brenda Oakden, age 19, a roommate of a receptionist at Livingston's escort service. Oakden had worked for the service on one occasion. At defendant's request, Burns escorted a nervous Oakden to the warehouse. Defendant later told Livingston that he had killed Oakden and directed Livingston to tell Oakden's roommate that Oakden had left to "catch a bus." He later told her "[t]hat the only difference between killing someone now and killing someone as a policeman" was that the police had permission to do it.

Defendant confided to Michael Shing, another escort service owner, that he had murdered a pimp and his prostitute and stuffed their bodies into barrels. He told Shing that if anyone ripped him off, he killed them. He described how he had forced his victims to kneel before he shot them and how profusely they bled. He sought Shing's advice as to how to dispose of the bodies. Shing suggested Searsville Lake. Defendant later told Livingston that he had to dispose of the barrels because they were stinking up his warehouse.

The bodies of Brenda Oakden, Michael Thomas and Phyllis Melendrez were found in barrels in Golden Gate Park. All three died of gunshot wounds to the back of the head. Melendrez had been struck in the lip before she was killed and had a defensive wound on her hand.

In addition to his admissions, defendant was linked to the three murders by a variety of physical and other evidence. The barrels in which the bodies were found had been stolen from a storage yard located three structures away from defendant's warehouse. Defendant's fingerprints were found in two places on the barrels. In one place, the prints were left in wet concrete

apparently mixed and poured to seal the barrel. Angel Burns's palm print was also found on one barrel. Defendant gave inconsistent statements about the barrels, stating when arrested that he had never touched the barrels, but later testifying that he had seen them on his property and had touched the wet concrete out of curiosity.

Plastic bags resembling those around Michael Thomas's corpse were recovered from defendant's van; the recovered bags displayed a design defect identical to the defect in the bag around the corpse. Napkins similar in color and red wire were also found in the warehouse and vicinity as well as on the corpse. Various handguns and ballistics textbooks were also found at the warehouse. Defendant's removal of the barrel of one of the guns, a Smith & Wesson revolver, made it impossible to identify it as a murder weapon. Defendant's explanation for removing the barrel—that he wanted to install a longer one for target shooting—was contradicted by of one of his employees, who testified that defendant had declined an invitation to go target shooting because, according to defendant, it did not interest him.

### 3. *Barbara Searcy*

Barbara Searcy went to defendant's warehouse with Raleigh Hall, her landlord, to collect money defendant owed her. Searcy later told a friend that she was waiting to hear back from a man she had seen several times and was planning to see in Burlingame. At about the same time, defendant left a message on Searcy's answering machine stating he had "fifty" for her and wanted a "date." Defendant testified that he had sex with Searcy on several occasions and used cocaine with her. Although he did not consider these to be "dates" in the "professional" sense, he admitted giving her money when she needed it.

Defendant later gave Livingston a satchel containing Searcy's clothing and personal items and told her that he badly wanted to recover a recording on Searcy's answering machine. He later indicated that Livingston would be able to go to Searcy's apartment, recover the recording, and steal the rest of her property. Livingston attempted the theft in the company of another man but was frightened away. She returned to the warehouse empty-handed.

When Livingston returned to the warehouse, defendant showed her Searcy's body, wrapped in opaque plastic sheeting, in a green hamper outside the warehouse. He explained that he had killed Searcy for "personal reasons." They loaded her body into defendant's pickup truck. Defendant said he was going to drag the body so it would be beyond recognition. While

attempting to drag the body behind the truck, defendant and Livingston unexpectedly encountered a witness and sped away, leaving the body.

Searcy's body was discovered the next day. Defendant's right footprint was found on a green trash bag stained with Searcy's blood and located at the discovery point. Searcy died of a gunshot wound to the back of the head. Deep scraping, consistent with her body being dragged, was inflicted after death. Searcy had been bound. White cotton rope was found along the road near the body and around Searcy's wrist. Similar rope was recovered from defendant's van. Yellow ski rope was around Searcy's ankles. During a search of the warehouse, police seized yellow ski rope containing a microscopic defect identical to a defect in the rope binding Searcy.

Following his arrest for Searcy's murder, defendant telephoned Livingston and asked her to contact Michael Francis, a juvenile, to see if he would "take the fall" for the crime in exchange for $10,000. He later offered an additional $10,000 if Francis would do the same for the Kathryn Barrett murder (see discussion, *post*), and predicted Francis would serve only a year or two in jail. Defendant was overheard by police asking Francis what he thought of the "deal" and telling Francis he would have an excellent chance for diminished capacity.

### 4. *Kathryn Barrett*

Kathryn Barrett, a drug dealer, offered to sell defendant six ounces of cocaine. Defendant's friend, Michael Francis, suggested that they steal the cocaine. Defendant agreed. At defendant's request, Livingston drove Barrett to defendant's warehouse and went to a local bar to wait. Defendant called Livingston two hours later and told her she need not pick up Barrett.

When Livingston returned to the warehouse, she observed Francis stabbing Barrett in the chest. When Livingston started to leave, defendant followed and intercepted her, telling her Barrett would not be recognized even if someone found her.

Still alive, Barrett continued to moan. Disgusted with Francis's inability to kill Barrett, defendant returned to their location in the warehouse. Francis later emerged alone, looking ill. He told Livingston that defendant had hit Barrett in the mouth with a sledgehammer, stating he could still hear her bones cracking.

Barrett's body was found nude, wrapped in plastic sheeting, on a street in South San Francisco. On post mortem examination, her death was attributed to swelling around the brain, loss of blood resulting from knife wounds,

and trauma inflicted with considerable force using a blunt instrument. Defendant's footprint was found on the plastic sheeting surrounding her body. A Benson and Hedges cigarette butt found on Barrett's forearm bore a batch number identical to cigarettes in a pack found in the warehouse. Other physical evidence—metal shavings and the plastic bag—also linked Barrett's murder to the warehouse.

Defendant testified on his own behalf at the guilt phase, denying that he committed any of the murders and attempting to place the blame on his companions.

*The Penalty Phase*

Defendant was married to his second wife for a little more than a year. She had a daughter by a previous marriage. When they decided to divorce, the wife and daughter moved out of defendant's house. The morning they left, defendant was up early. The child and her grandmother went to the backyard where the child's pet ducks were kept. At the time, several ducklings had just hatched. The child and grandmother were horrified to discover the baby ducklings torn apart, their heads ripped off.

During one of a series of harassing phone calls to his estranged wife after the incident (the call was monitored by an acquaintance of the wife who testified to defendant's statements), defendant said he was going to cut her daughter's heart out as he had done with the ducks. He then described how he had twisted the necks off the ducks and took their hearts out. He also made other threats of violence, including death, directed toward his wife, her daughter, and her parents.

Defendant was portrayed by various defense witnesses as a good electrician and employer who had much concern for children and animals. One witness speculated that the ducks had been killed by raccoons. The defense also called an assistant district attorney to testify that the prosecution was seeking life imprisonment without possibility of parole in the case of Angel Burns, defendant's accomplice. On cross-examination, the prosecutor explained that the penalty decision in Burns's case had been based on three factors: (1) Burns was directly involved only in the Fravel murder; (2) she was only 21; and (3) she was dominated and controlled by defendant, who was the main actor in each case.

## GUILT PHASE ISSUES

### I. *The Plea Bargain Agreement With Tina Livingston*

Defendant argues the trial court committed reversible error in violation of the rule of *People v. Medina* (1974) 41 Cal.App.3d 438, 455-456

[116 Cal.Rptr. 133], in receiving the accomplice testimony of Tina Livingston, with whom the prosecution had entered into a plea agreement. Under the terms of that agreement, Livingston was permitted to plead guilty as an accessory to the Kathryn Barrett murder (§§ 32, 187) and to admit a 1976 manslaughter conviction. She was convicted based on her plea and received a three-year sentence.

The basic condition of the plea, repeated several times in the written plea agreement, was that Livingston provide "truthful and complete" statements and testify "truthfully and completely in all criminal proceedings." She was also required to submit to a polygraph examination and to answer truthfully the questions put to her during the examination. Finally, in a separate condition that defendant now assails, she was required to pass a polygraph examination stating "that she had no physical involvement in or encouragement of the deaths of Gloria Jean Fravel, Phyllis Melendrez aka Chris Thomas, Michael K. Thomas, Brenda Oakden aka Brenda Rule, and Barbara Lee Searcy."

Defendant argues that the plea condition requiring Livingston to pass a polygraph examination with respect to her noninvolvement in the murders effectively compelled her to deny in her testimony that she was the perpetrator or an accomplice in any of the murders in violation of *Medina*. We reject the argument for two independent reasons.

First, having failed to advance the argument below by way of pretrial motion, objection to Livingston's testimony, or other appropriate means, defendant has waived the claim. (See Evid. Code, § 353; *People v. Hamilton* (1988) 46 Cal.3d 123, 141-142 [249 Cal.Rptr. 320, 756 P.2d 1348]; *People v. Poggi* (1988) 45 Cal.3d 306, 331 [246 Cal.Rptr. 886, 753 P.2d 1082]; *People v. Burns* (1987) 196 Cal.App.3d 1440, 1453 [242 Cal.Rptr. 573].)

Second, even assuming defendant had presented the argument below, he fails to show that the plea condition was impermissibly coercive. As we observed in *People v. Allen* (1986) 42 Cal.3d 1222, 1251-1252 [232 Cal.Rptr. 849, 729 P.2d 115]: " '[A] defendant is denied a fair trial if the prosecution's case depends substantially on accomplice testimony *and the accomplice witness is placed, either by the prosecution or by the court, under a strong compulsion to testify in a particular fashion.*' . . . Thus, when the accomplice is granted immunity subject to the condition that his testimony substantially conform to an earlier statement given to police . . . or that his testimony result in defendant's conviction . . . the accomplice's testimony is 'tainted beyond redemption' and its admission denies defendant a fair trial. *On the other hand, although there is a certain degree of compulsion inherent in any plea agreement or grant of immunity, it is clear*

*that an agreement requiring only that the witness testify fully and truthfully is valid.*" (Italics added.)

The polygraph condition did not dictate Livingston's testimony. On its face, it merely required her to show *in a polygraph examination* that she was not involved in the murders. She was not committed to a script. She remained free *to testify* as she desired, without having to subscribe to any particular version of events. For example, she remained free to testify, without violating the condition, that defendant did not commit the murders or that someone else, including herself, was responsible. As such, the condition itself did not *compel* Livingston to testify in any particular manner, any more than, for example, the fact that she had given previous statements to the effect that defendant, and not she, had killed the victims.

As we explained in *People* v. *Fields* (1983) 35 Cal.3d 329, 361 [197 Cal.Rptr. 803, 673 P.2d 680]: "We recognize that a witness . . . is under some compulsion to testify in accord with statements given to the police or the prosecution. The district attorney in the present case obviously believed that [the witness's] last statement was a truthful account, and if she deviated materially from it he might take the position that she had breached the bargain, and could be prosecuted as a principal to murder. But despite this element of compulsion, it is clear, and the cases so hold . . . that an agreement which requires only that the witness testify fully and truthfully is valid, and indeed such a requirement would seem necessary to prevent the witness from sabotaging the bargain. We believe the requirements of due process, as explained in *Medina*, are met if the agreement thus permits the witness to testify freely at trial and to respond to any claim that he breached the agreement by showing that the testimony he gave was a full and truthful account." (Citation omitted.)

Under the plea condition at issue here, although Livingston was under some pressure to adhere to her statements that she had not killed any of the victims, she was nonetheless required to give a complete and truthful account at trial in order to avoid breaching the plea agreement. No more is required to satisfy *Medina, supra,* 41 Cal.App.3d 438. (See also *People* v. *Garrison* (1989) 47 Cal.3d 746, 768-771 [254 Cal.Rptr. 257, 765 P.2d 419]; *People* v. *Allen, supra,* 42 Cal.3d at pp. 1251-1255; *People* v. *Meza* (1981) 116 Cal.App.3d 988, 994 [172 Cal.Rptr. 531].)

Not only was Livingston not improperly coerced to testify "in a particular fashion," moreover, the circumstances corroborating her testimony were manifold. (*People* v. *Sepeda* (1977) 66 Cal.App.3d 700, 709 [136 Cal.Rptr. 119].) With respect to each of the six counts, Livingston's testimony was corroborated by physical evidence, the testimony of other witnesses, or

both. The defense had a full and fair opportunity, with full knowledge of the terms of the plea agreement, to impeach Livingston's testimony and to argue her credibility to the jury. Under these circumstances, defendant was not denied a fair trial. (*People v. Morris* (1991) 53 Cal.3d 152, 192-193 [279 Cal.Rptr. 720, 807 P.2d 949]; *People v. Bittaker* (1989) 48 Cal.3d 1046, 1094 [259 Cal.Rptr. 630, 774 P.2d 659]; *People v. Allen, supra,* 42 Cal.3d at p. 1255, fn. 10; *People v. Harpool* (1984) 155 Cal.App.3d 877, 885 [202 Cal.Rptr. 467].)

II. *CALJIC No. 2.11.5—Unjoined Perpetrators of the Same Crime*

The court instructed the jury in accordance with CALJIC No. 2.11.5 as follows: "There has been evidence in this case indicating that a person other than defendant was or may have been involved in the crime or crimes for which the defendant is on trial. You must not discuss or give any consideration as to why the other person is not being prosecuted in this trial. Or whether he or she has been or will be prosecuted."

■ Defendant argues he was prejudiced by this instruction because the jury could conceivably have applied it to prosecution witness Tina Livingston, thus disregarding his attempted impeachment of her testimony. We reject his argument on several grounds.

Initially, as defendant concedes, his claim of error amounts to an assertion that the instruction, although properly given based on the evidence, was too general to the extent it could be viewed as applying to Livingston, a prosecution witness. As defendant's opening brief states: "In the present matter, CALJIC 2.11.5 would have properly been given if it had been expressly limited to Angel Burns and Michael Francis, neither of whom testified. As given, however, the instruction applied equally to Livingston." Defendant, however, requested no limiting instruction. ■ He has, therefore, waived any assignment of error. (*People v. Lang* (1989) 49 Cal.3d 991, 1024 [264 Cal.Rptr. 386, 782 P.2d 627] ["A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language."]; *People v. Andrews* (1989) 49 Cal.3d 200, 218 [260 Cal.Rptr. 583, 776 P.2d 285].)

■ We reject defendant's claim on the merits as well. Although the challenged instruction should be clarified when an accomplice testifies, any failure to do so in this case did not prejudice defendant. The instruction was not given in isolation. The jury was instructed in accordance with CALJIC Nos. 2.20 (credibility of witness) and 2.23 (credibility of witness—conviction of felony). The jury was also told to consider the instructions as a

whole in accordance with CALJIC No. 1.01. As to the Fravel murder, the jury was given a full set of accomplice instructions consisting of CALJIC Nos. 3.10, 3.11, 3.12, 3.14, 3.18, and 3.19. No other accomplice instructions were required based on the evidence (see, *post*, pt. VIII). The defense conducted a thorough cross-examination of Livingston as to her plea bargain, her prior criminal background, and her involvement in defendant's activities. Her credibility was vigorously challenged before the jury.

In *People* v. *Belmontes* (1988) 45 Cal.3d 744, 782-783 [248 Cal.Rptr. 126, 755 P.2d 310], we held that a defendant's claim that the jury might have misunderstood CALJIC No. 2.11.5 as applying to a prosecution witness was implausible when evaluated in light of the accomplice and credibility instructions that were also given. This case is indistinguishable from *Belmontes*. (See also *People* v. *Williams* (1988) 45 Cal.3d 1268, 1312-1313 [248 Cal.Rptr. 834, 756 P.2d 221].) As these cases indicate, a reasonable jury given these instructions would most likely conclude that, although it could not consider the simple fact of nonprosecution in evaluating the witness's credibility, it could consider the plea bargain, prior felony convictions, and bias or motive to falsify based on all other pertinent factors. In addition, we have also held on several occasions, largely for the same reasons, that the giving of CALJIC No. 2.11.5 was not prejudicial. (*People* v. *Carrera* (1989) 49 Cal.3d 291, 312-313 [261 Cal.Rptr. 348, 777 P.2d 121]; *People* v. *Garrison, supra*, 47 Cal.3d 746, 779-780; *People* v. *Malone* (1988) 47 Cal.3d 1, 50-51 [252 Cal.Rptr. 525, 762 P.2d 1249].) Again, there is no substantial difference between our prior cases and this one.

III. *Defense Cross-examination of Tina Livingston*

██ Defendant argues his right to cross-examine Livingston was improperly abridged on two occasions, thereby denying his right to confrontation. (*Delaware* v. *Van Arsdall* (1986) 475 U.S. 673 [89 L.Ed.2d 674, 106 S.Ct. 1431]; Cal. Const., art. I, § 28, subd. (d).) To the contrary, the trial court acted properly on both occasions; no error occurred and no prejudice to defendant resulted.

██ Neither *Van Arsdall* nor our state's "Right to Truth-in-Evidence" provision requires unlimited cross-examination of witnesses. As the high court said in *Delaware* v. *Van Arsdall*: "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." (475 U.S. at p. 679 [89 L.Ed.2d at p. 683].) The "Right to Truth-in-Evidence" provision expressly provides, "[n]othing in this section shall affect any existing

statutory rule of evidence relating to privilege or hearsay, or Evidence Code, Sections 352, 782 or 1103." (Cal. Const., art. I, § 28, subd. (d).)

Evidence Code section 352 empowers the trial court in its discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (See also *People* v. *Harris* (1989) 47 Cal.3d 1047, 1080-1081 [255 Cal.Rptr. 352, 767 P.2d 619] [trial court retains authority to exclude evidence or limit cross-examination when relevance is insignificant as compared with potential for prejudice and confusion].)

Even if a trial court's discretion to refuse admission or cross-examination on the above mentioned grounds is abused, the error is subject to harmless error analysis based on factors such as: "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." (*Delaware* v. *Van Arsdall, supra,* 475 U.S. at p. 684 [89 L.Ed.2d at pp. 686-687]; see also *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 751-752 [230 Cal.Rptr. 667, 726 P.2d 113]; *United States* v. *Soriano* (9th Cir. 1989) 880 F.2d 192, 197.)

 Livingston was cross-examined at length about her Illinois manslaughter conviction for killing one Darlene Moore. At one point in her testimony, Livingston volunteered that she had not killed anyone before she killed Moore. Defense counsel attempted to impeach her testimony by questioning her about an incident after Moore's death in which Livingston had painted herself purple and participated in a witchcraft ritual including the burial of a jar containing the names of police investigators in the Moore case. He offered to prove that when police had searched the yard and found the buried jar, they also found a decomposed fetus. The police investigation reached no conclusion as to whether the fetus had been alive.

Counsel argued that the evidence showed Livingston was part of a group that had practiced sacrifice of babies as part of their ritual. After a hearing outside the presence of the jury, the trial court precluded the attempted impeachment.

As defense counsel himself correctly conceded, the impeachment value of the witchcraft evidence was marginal; there was no evidence that a murder had actually occurred or that Livingston had participated in it. There was

potential for prejudice: Livingston's mere association with witchcraft, without more, was peripheral to the issue in the case, including her credibility. Under the circumstances, the court was within its discretion in prohibiting the attempted cross-examination on the issue of witchcraft.

On another occasion, defense counsel asked Livingston whether she had made any false accusations against police officers in connection with the Moore investigation. Livingston had previously admitted making false statements about her involvement in Moore's death. The prosecutor objected; again the matter was discussed outside the presence of the jury. Defense counsel maintained he had information Livingston had falsely accused an Illinois police officer of drug trafficking. He argued Livingston had made a habit of making false accusations against others to cover up her own misconduct and she had done so in this case. The court disallowed the attempted impeachment, observing that the incident was a collateral matter and not legally relevant to Livingston's credibility.

Defendant does not demonstrate any abuse of discretion in the ruling. Initially, the record reveals no evidence that Livingston's accusations about the Illinois officer were false. That officer had refused to participate in an internal affairs investigation of the accusation. In view of the remoteness of the incident in time, place, and substance from the issues in this case and the question of Livingston's credibility, the court did not abuse its discretion in precluding any further reference to it. Moreover, even if we were to assume the relevance of the incident for impeachment purposes, there was no conceivable prejudice to defendant, who was permitted to explore and argue to the jury Livingston's conviction of the Moore killing *and* her false statements concerning that incident. In short, defendant had ample opportunity to challenge Livingston's credibility and did so.

## IV. *Joinder and Severance of Multiple Counts*

The People initially filed one complaint alleging the Fravel murder and a second complaint alleging the remaining five homicide counts. Defendant moved to sever the counts, which would have resulted in five separate trials for the different victims: (1) Melendrez and Thomas, (2) Oakden, (3) Searcy, (4) Barrett, and (5) Fravel. The People moved for consolidation of all charges into a single proceeding. The court denied defendant's motion to sever and granted the People's motion for consolidation.

In Proposition 115, the "Crime Victims Justice Reform Act," adopted June 5, 1990, the voters made basic changes in California law governing joinder and severance of criminal cases. Among those changes, section 30, subdivision (a), was added to article I of the California Constitution,

declaring that the Constitution will not be construed to bar joinder of criminal cases as may be provided by law. In addition, section 954.1 was added to the Penal Code stating that jointly charged offenses need not be cross-admissible to be joined for trial. (See *Raven* v. *Deukmejian* (1990) 52 Cal.3d 336, 343 [276 Cal.Rptr. 326, 801 P.2d 1077].) In this case, however, defendant was tried before the adoption of Proposition 115; we therefore apply pre-Proposition 115 law in our review of the issues of joinder and severance. (*Tapia* v. *Superior Court* (1991) 53 Cal.3d 282, 289, 299-300 [279 Cal.Rptr. 592, 807 P.2d 434].)

 Defendant asserts the trial court abused its discretion in its rulings on joinder and severance, although he concedes the Oakden count was properly joined with Melendrez and Thomas (the three "Golden Gate Park barrel murders") and now maintains four separate trials were required. Although admitting all six murder counts were "offenses within the same class" under section 954, defendant submits severance was required "in the interests of justice" under that statute and to protect defendant's right to due process. We discern no merit in either the statutory or the due process argument.

 We have held, "A ruling on a motion to sever is based on a weighing of the probative value of any cross-admissible evidence against the prejudicial effect of evidence the jury would not otherwise hear, but in the weighing process the beneficial results of joinder are added to the probative value side. Therefore a defendant seeking severance must make an even stronger showing of prejudicial effect than would be required in determining whether to admit other-crimes evidence in a severed trial." (*People* v. *Bean* (1988) 46 Cal.3d 919, 936 [251 Cal.Rptr. 467, 760 P.2d 996]; see also *People* v. *Miller* (1990) 50 Cal.3d 954, 987 [269 Cal.Rptr. 492, 790 P.2d 1289].)

If the evidence in each case is shown to be cross-admissible in the others, ordinarily any inference of prejudice from joinder of charges is dispelled. (50 Cal.3d at p. 987; *People* v. *Walker* (1988) 47 Cal.3d 605, 622 [253 Cal.Rptr. 863, 765 P.2d 70].) In addition to cross-admissibility of evidence among the various counts, other factors to be considered in a severance analysis include: (1) whether certain of the charges are particularly inflammatory; (2) whether one, but not all, of the charges involves the death penalty; and (3) whether a weak case has been joined with a strong one so as to produce a spillover effect that unfairly strengthens the weak case. (*Frank* v. *Superior Court* (1989) 48 Cal.3d 632, 639-641 [257 Cal.Rptr. 550, 770 P.2d 1119].)

 The Attorney General maintains that evidence of the various offenses was cross-admissible on the issue of identity because the offenses

shared a number of common marks having a substantial degree of distinctiveness. (*Miller, supra*, 50 Cal.3d at p. 987.) The record supports the Attorney General's contention. There were several common marks among the offenses, including: (1) evidence discovered during searches of defendant's warehouse suggested each of the victims was killed there (see *People* v. *Brock* (1967) 66 Cal.2d 645, 655 [58 Cal.Rptr. 321, 426 P.2d 889]); (2) each of the bodies was removed from the warehouse, encased in plastic, barrels, etc., and then disposed of in such a way as to attract media attention (see *People* v. *Grant* (1988) 45 Cal.3d 829, 865 [248 Cal.Rptr. 444, 755 P.2d 894]); (3) each victim was lured to the warehouse on a pretext related to defendant's penchant for prostitutes and cocaine, and then killed (Melendrez, Oakden, Searcy and Fravel were brought there to provide sexual favors for defendant; Thomas accompanied Melendrez; and Barrett came there thinking defendant would purchase drugs from her); (4) all victims except Barrett were prostitutes or pimps, and she was a drug dealer (*People* v. *Ruiz* (1988) 44 Cal.3d 589, 605 [244 Cal.Rptr. 200, 749 P.2d 854]); and (5) all killings occurred within a six-month time frame.

Although defendant seeks to diminish the effect of certain of these factors, his argument does not reduce their combined weight. For example, defendant maintains others had access to the warehouse and could have committed the murders. But defendant not only owned the warehouse, he also lived *and* worked there. By his own admission, he controlled "what came in and out." An eight-year employee of defendant testified that the back of the warehouse, where most of defendant's criminal activity took place, was defendant's private domain; the employee had been allowed there only a few times. Similarly, although defendant correctly observes that not all his victims were prostitutes, four of the six victims were prostitutes, one was a pimp, and one was a drug dealer. Again, by defendant's own admission to police, he combined sex with prostitutes and cocaine use at the warehouse on a regular basis. As defendant put it, he liked to "chase women" and "do dope." Considered together, these common features are highly suggestive of a single, common perpetrator. (*Miller, supra*, 50 Cal.3d at pp. 988-989.) They support the court's decision not to sever the various counts for separate trials.

Nor do any of the other relevant factors to be considered favor a holding of abuse of discretion or prejudice in declining to order severance in this case. All of the charges involved the death penalty, all were bizarre and potentially inflammatory, and none was particularly weak in evidentiary support when compared with the others. There was neither error nor prejudice in the joint trial of the six charges against defendant.

## V. *Other-crimes Evidence: The Tafoya and Armstrong Incidents*

Three incidents of other-crimes evidence were admitted over defense objection. Two are the subject of the present argument; the remaining incident is dealt with in part VI, *post.*

When defendant was arrested for the Searcy murder in August 1983, he was asked by police about sado-masochistic acts he may have performed on women at the warehouse. Police questioning in this regard emanated from evidence of binding and physical abuse on the bodies of the female murder victims discovered before that time. Defendant responded he was not interested in bondage and had performed it only once, in Los Angeles.

The prosecution moved to admit evidence of the imprisonment and rape of Monica Tafoya by defendant on May 14, 1983. According to Tafoya, defendant caused her to be handcuffed, gagged her, raped her twice, and orally sodomized her several times during a more-than-eight-hour ordeal at the warehouse. Defendant freebased cocaine during the incident.

The prosecution also sought to present evidence of a bondage episode during which defendant allegedly strung Diane Armstrong by her wrists from the ceiling of the warehouse against her will and choked and punched her when she resisted. Defendant also freebased cocaine during the Armstrong incident.

In admitting the evidence, the trial judge accepted prosecution arguments of its relevance to the Fravel murder and remarked that it was pertinent to other charges as well. Conceding the relevance of the evidence to the Fravel count, defendant argues it was irrelevant to the other counts and that the trial court abused its discretion by admitting it. He also maintains the record does not reflect an adequate weighing by the court of the prejudicial and probative effects of the evidence under Evidence Code section 352. Neither argument has merit.

The admissibility of other-crimes evidence depends on three principal factors: (1) the materiality of the fact sought to be proved or disproved; (2) the tendency of the uncharged crime to prove or disprove the material fact; and (3) the existence of any rule or policy requiring the exclusion of relevant evidence, e.g., Evidence Code section 352. (*People* v. *Robbins* (1988) 45 Cal.3d 867, 879 [248 Cal.Rptr. 172, 755 P.2d 355], citing *People* v. *Thompson* (1980) 27 Cal.3d 303, 315 [165 Cal.Rptr. 289, 611 P.2d 883].)

The record reveals the incidents' relevance to the issues of identity and intent of the perpetrator. The comparison with the Fravel murder is

readily apparent: in all three instances defendant bound or caused the bondage of prostitutes against their will in his warehouse while using cocaine. The warehouse, and particularly the rear section, was the site of all of the murders. The female murder victims were left nude, suggesting sexual motivations. Several of them were bound or physically abused; e.g., Armstrong, Melendrez, and Barrett were struck in the face. Thus, illicit sex and cocaine and the abuse of prostitutes were common to defendant's crimes. The patterns are sufficient to support the admission of the other-crimes evidence. (See *Robbins, supra,* 45 Cal.3d at p. 880; *People* v. *Allen, supra,* 42 Cal.3d at pp. 1270-1271.)

Contrary to defendant's argument, the record shows the court engaged in the process of weighing probative value against prejudicial effect. The prosecution and the defense briefed and argued to the court the issue of prejudice. Although most of the court's remarks referred to the relevance and probative value of the evidence to show identity, it acknowledged defendant's right to a fair trial and shifting trends in appellate litigation of the issue. These remarks imply a consideration of prejudicial effect. No more is required under our case law. (*People* v. *Malone, supra,* 47 Cal.3d 1, 21-22; *People* v. *Griffin* (1988) 46 Cal.3d 1011, 1028 [251 Cal.Rptr. 643, 761 P.2d 103].) Moreover, in view of the prosecutor's showing that the other-crimes evidence was highly relevant and properly received, any inadvertent failure to recite the operative facts or the appropriate legal factors was harmless. (*People* v. *Frank* (1985) 38 Cal.3d 711, 732 [214 Cal.Rptr. 801, 700 P.2d 415]; *Malone, supra,* 47 Cal.3d at p. 22.)

## VI. *Other-crimes Evidence: The Garcia Incident*

The prosecution also offered evidence that Angel Burns lured Louisa Garcia to the warehouse to have sex with defendant. When Garcia realized the purpose of the visit and refused, defendant, who was freebasing cocaine, threatened to "torch her face" with a flame if she did not orally copulate him. She acquiesced, then attempted to escape. Defendant, assisted by Angel Burns, caught Garcia and hit and kicked her until her face looked "like two."

After initially rejecting the prosecution's attempt to introduce the Garcia incident in its case-in-chief on the issue of identity, the court permitted its introduction in rebuttal in response to testimony by defendant's former girlfriend, Lynn Brand, that although defendant got angry, he had never been violent. The colloquy on the record shows that the court considered the evidence both as rebuttal evidence and as evidence relating to defendant's motive to kill Melendrez and Thomas.

 Defendant maintains evidence of the Garcia incident was inadmissible on either ground argued by the prosecution. He initially argues the prosecution cannot show a defendant's character by a specific instance of conduct. (Evid. Code, § 1101, subd. (a).) As the parties note, our decision in *People v. Harris, supra,* 47 Cal.3d 1047, 1080-1083, leaves open the question whether the "Right to Truth-in-Evidence" provision of Proposition 8 in effect repeals Evidence Code section 1101 and our prior decision in *People v. Wagner* (1975) 13 Cal.3d 612, 618-619 [119 Cal.Rptr. 457, 532 P.2d 105]. (See also *People v. Lankford* (1989) 210 Cal.App.3d 227, 235 [258 Cal.Rptr. 322].) We need not resolve that question here, however, because the trial court did not abuse its discretion in admitting the Garcia incident as evidence of defendant's motive.

Livingston testified defendant admitted to her he had "taken care of" a Tenderloin couple for Burns in order to compensate for defendant's disappointing Burns by not killing Garcia. Although it is true, as defendant observes, that there was contrary testimony from Michael Shing that defendant had admitted killing a pimp and a prostitute because they had "ripped him off," Livingston's testimony does not thereby become irrelevant or more prejudicial than probative. Based on all the circumstances, the jury was entitled to credit Livingston's testimony and to consider the Garcia incident as the motive for the killings of Melendrez and Thomas. Moreover, the Garcia incident also reflects defendant's pattern of luring prostitutes to his warehouse and physically abusing them. It shows both intent and modus operandi. The principal difference between the Garcia incident and the Fravel and Searcy incidents was the outcome: Garcia was not killed. For the reasons stated above, we reject defendant's claim of error.

VII. *The Lopez Incident*

 Christina Lopez was a prostitute who provided sexual services to defendant about 10 times, all in late 1982. On one of these occasions, Lopez observed defendant retrieve some new white rope from his truck and hide it behind a couch in the warehouse. Evidence of the incident was admitted over defense objection based on relevance. As the Attorney General points out, the proffered evidence shows that defendant had access to white cotton rope at the warehouse. Similar rope was found in the vicinity of Barbara Searcy's body and around her wrist. More rope was recovered from defendant's van. The evidence was relevant and admissible. No error was committed in allowing the jury to consider it. (See *People v. Johnson* (1989) 47 Cal.3d 576, 589 [253 Cal.Rptr. 710, 764 P.2d 1087]; *People v. Huber* (1986) 181 Cal.App.3d 601, 622-623 [227 Cal.Rptr. 113].)

## VIII. *Accomplice Instructions Regarding Livingston's Role in the Barrett Murder*

 Defendant contends that the court had a sua sponte duty to instruct the jury to decide whether Livingston was an accomplice in the murder of Kathryn Barrett (CALJIC No. 3.19) and further, if it so found, that it was required to view her testimony with distrust (CALJIC No. 3.18) and to require corroboration by independent evidence (CALJIC No. 3.12). The court so instructed the jury in connection with Livingston's role in the Fravel murder, but not the Barrett murder. On review of the record, we find neither error nor prejudice. Livingston was not an accomplice in the Barrett murder. Even if she could be so viewed, her testimony was sufficiently corroborated.

At defendant's request, Livingston brought Barrett to the warehouse. Defendant told Livingston that he wanted to buy some cocaine from Barrett, and that he would test it and then pay for it. Livingston dropped Barrett off at the warehouse and then went to a bar where she remained for two hours. Defendant called her at the bar and told her she need not return to retrieve Barrett because "it was all taken care of." When Livingston returned to the warehouse to pick up her car, she saw Michael Francis standing over Barrett's nude body, knife in hand. As she watched, Francis stabbed Barrett. Livingston sought out defendant and expressed concern that the incident would be traced to her and ultimately to defendant. Defendant became angry and proceeded to the back room where Francis and Barrett were located. Francis later emerged alone, exclaiming that defendant had hit Barrett in the face with a sledgehammer. Livingston then left the scene.

 An accomplice is a person "who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111; *People* v. *Miranda* (1987) 44 Cal.3d 57, 99 [241 Cal.Rptr. 594, 744 P.2d 1127].) In order to be an accomplice, the witness must be chargeable with the crime as a principal (§ 31) and not merely as an accessory after the fact (§§ 32, 33). (*People* v. *Balderas* (1985) 41 Cal.3d 144, 193-194, fn. 22 [222 Cal.Rptr. 184, 711 P.2d 480].) An aider and abettor is chargeable as a principal, but his liability as such depends on whether he promotes, encourages, or assists the perpetrator and *shares* the perpetrator's criminal purpose. (*Id.* at p. 194.) It is not sufficient that he merely gives assistance with knowledge of the perpetrator's criminal purpose. (*Ibid.*; *People* v. *Beeman* (1984) 35 Cal.3d 547, 556-561 [199 Cal.Rptr. 60, 674 P.2d 1318].)

Accomplice status is a question of fact for the jury unless the evidence permits only a single inference. (*Garrison, supra*, 47 Cal.3d at p. 772;

*Rodriguez, supra*, 42 Cal.3d at pp. 758-759.) Defendant must establish the accomplice status of a prosecution witness by a preponderance of the evidence. (*People* v. *Anderson* (1987) 43 Cal.3d 1104, 1138 [240 Cal.Rptr. 585, 742 P.2d 1306].)

■ The evidence does not support an inference of accomplice liability on Livingston's part. The facts that she was at the scene (*Rodriguez, supra*, 42 Cal.3d at p. 761) or drove the victim there (*Balderas, supra*, 41 Cal.3d at pp. 193-194) do not make her an accomplice. Defendant's theory, that Livingston knew Barrett was to be robbed and that her death (at defendant's hands) was clearly foreseeable, is at best highly speculative. Sua sponte accomplice instructions were not required. (*Rodriguez, supra*, 42 Cal.3d at p. 761.)

Even assuming accomplice instructions were required, defendant suffered no harm. ■ Accomplice testimony must be corroborated. (§ 1111.) Corroborating evidence "must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but it is not necessary that the corroborative evidence be sufficient in itself to establish every element of the offense charged." (*People* v. *Bunyard* (1988) 45 Cal.3d 1189, 1206 [249 Cal.Rptr. 71, 756 P.2d 795], internal quotation marks omitted.) If there is ample evidence corroborating the accomplice's testimony, an error in failing to give accomplice instructions is harmless. (*People* v. *Miranda, supra*, 44 Cal.3d at p. 100.)

■ There was more than ample corroborating evidence. Defendant's footprint was found on the plastic sheeting used to wrap Barrett's body, contradicting his story that he was totally uninvolved. A cigarette butt on the body bore the same batch number as a pack of cigarettes found in the warehouse. Other physical evidence—metal shavings and the plastic bag—linked Barrett's murder to the warehouse. Autopsy findings supported Livingston's version of the murder, including the sledgehammer blow struck by defendant.

Finally, the jury heard evidence of Livingston's plea bargain, her felony record, and her involvement in the crimes charged as well as accomplice instructions regarding the Fravel murder. With these matters before it, the jury was undoubtedly skeptical of Livingston's testimony. Little would have been gained by merely referring to the Barrett murder in the accomplice instructions. There was no prejudicial error in failing to do so. (*Miranda, supra*, 44 Cal.3d at p. 101.)

IX. *Michael Francis's Spontaneous Statement That Defendant Struck Kathryn Barrett in the Face With a Sledgehammer*

Defendant next challenges as a violation of the confrontation provisions of the United States and California Constitutions (U.S. Const., 6th and 14th Amends.; Cal. Const., art. I, § 15) the admission of Livingston's testimony that Michael Francis emerged from the back room of the warehouse and exclaimed that defendant had smashed Barrett's face with a sledgehammer. Defendant's challenge must be rejected for two independent reasons.

First, by failing to object to the admission of the statement at trial, defendant waived any claim of error. (Evid. Code, § 353; *People* v. *Bonin* (1989) 47 Cal.3d 808, 845 [254 Cal.Rptr. 298, 765 P.2d 460].)

Second, there was no violation of the confrontation provisions. To avoid such a violation, the prosecution must: (1) "produce or demonstrate the unavailability of, the declarant"; and (2) show that the spontaneous statement bears "sufficient 'indicia of reliability.'" (*People* v. *Farmer* (1989) 47 Cal.3d 888, 905 [254 Cal.Rptr. 508, 765 P.2d 940].) Having relied on his Fifth Amendment right not to give testimony against himself, Francis, the declarant, was not available as a witness. Moreover, as defendant concedes, Francis's statement was admissible under Evidence Code section 1240 as an excited utterance. Although this concession is not dispositive of the confrontation question, we have held that spontaneous and excited utterances have sufficient indicia of reliability to be admitted in evidence without violating a defendant's right to confront the witnesses against him. (*People* v. *Gallego* (1990) 52 Cal.3d 115, 175-176 [276 Cal.Rptr. 679, 802 P.2d 169]; *People* v. *Farmer, supra,* 47 Cal.3d at p. 905; see also *California* v. *Green* (1970) 399 U.S. 149, 155-156 [26 L.Ed.2d 489, 495-496, 90 S.Ct. 1930]; *People* v. *Jones* (1984) 155 Cal.App.3d 653, 663 [202 Cal.Rptr. 289].)

Moreover, contrary to defendant's suggestion that Francis's utterance must be regarded as self-serving and unreliable because he, too, was involved in the crime, the underlying facts show: a shocking event (defendant's smashing of Barrett's face with a sledgehammer), genuine emotional distress and actual physical illness on Francis's part as shown by his vomiting into a wastebasket, a simple observation by him, and no apparent opportunity to reflect or falsify. These factors supply a sound basis to regard Francis's utterance as reliable evidence. (See *McLaughlin* v. *Vinzant* (1st Cir. 1975) 522 F.2d 448, 450-451, cited in *Farmer, supra,* 47 Cal.3d at pp. 905-906.)

X. *Michael Francis's Hearsay Statement to Livingston as the Testimony of an Accomplice*

 Assuming the admissibility of the Francis excited utterance (see pt. IX, *ante*), defendant argues that the court should have instructed sua sponte that Francis's out-of-court statement was in effect the testimony of an accomplice, and thus required corroboration.

Francis was unquestionably an accomplice; he was convicted of the first degree murder of Barrett. Defendant asserts that the use of Francis's out-of-court statement as an excited utterance required corroboration despite the fact that Francis did not testify at defendant's trial. (See *Andrews, supra*, 49 Cal.3d at p. 214; *People v. Belton* (1979) 23 Cal.3d 516, 524-527 [153 Cal.Rptr. 195, 591 P.2d 485].)

We reject defendant's argument for two reasons. First, Francis's extrajudicial statement was not "testimony" within the meaning of section 1111 and therefore did not require corroboration. The usual problem with accomplice testimony—that it is consciously self-interested and calculated—is not present in an out-of-court statement that is itself sufficiently reliable to be allowed in evidence. (*People v. Pic'l* (1981) 114 Cal.App.3d 824, 873-874 [171 Cal.Rptr. 106], disapproved on other grounds in *People v. Kimble* (1988) 44 Cal.3d 480, 498 [244 Cal.Rptr. 148, 749 P.2d 803]; see also *People v. Harris* (1985) 175 Cal.App.3d 944, 954 [221 Cal.Rptr. 321].)

Second, Francis's statement was corroborated by the autopsy report showing Barrett's injuries as well as other evidence (see pt. VIII, *ante*). There was no reversible error.

XI. *Angel Burns's Statements to Tina Livingston Regarding Brenda Oakden's Return From the Warehouse*

 Over a defense objection of hearsay, Livingston was permitted to testify that Angel Burns told her that she (Burns) "would not be bringing [Brenda Oakden] back from the warehouse." According to Livingston, she initially thought Burns meant Livingston herself would have to drive to the warehouse to pick up Oakden. When Burns then told her to keep her mouth shut, she did not know what to think. An hour later, defendant told Livingston on the phone that Oakden had been killed. He told Livingston in another phone call before the murder that he was "feeling decadent." Oakden's body was later discovered in a barrel on which police found Burns's palm print and defendant's fingerprint.

By the time Burns made these statements she had already assisted defendant in the murder of Gloria Fravel by bringing Fravel to the warehouse

and aiding in the disposal of her body. Livingston was also present at the scene of that crime. The court admitted Burns's statements as declarations against penal interest (Evid. Code, § 1230) and as coconspirator statements (*id.*, § 1223). Because the evidence was properly admitted on the latter ground, we do not consider the former.

Burns's statements were admissible as made in furtherance of the objective of a conspiracy to which Burns was a part. (Evid. Code, § 1223.) They could reasonably be viewed as an attempt to commit a potential witness to silence, thereby concealing the murder of yet another prostitute by defendant and Burns. (*People v. Saling* (1972) 7 Cal.3d 844, 849, 852-853 [103 Cal.Rptr. 698, 500 P.2d 610].) Burns's involvement in procuring and transporting Fravel and Oakden to the warehouse and her active participation in Fravel's murder and the disposal of Fravel's body (see, *ante*, pp. 1211-1212) show the nature and object of the conspiracy and her role in it. These facts are sufficient to show prima facie evidence of a conspiracy, thereby justifying the admission of the evidence under the statute. (*People v. Belmontes, supra*, 45 Cal.3d 744, 788; *People v. Jourdain* (1980) 111 Cal.App.3d 396, 405 [168 Cal.Rptr. 702].) These facts are also sufficient indicia of reliability under confrontation provisions of the United States and California Constitutions. (*Bourjaily v. United States* (1987) 483 U.S. 171, 183-184 [97 L.Ed.2d 144, 157-158, 107 S.Ct. 2775].)

■ Given the admissibility of the statements pursuant to Evidence Code section 1223, defendant argues further that the trial court had a sua sponte duty to instruct the jury on the definition of an uncharged conspiracy (CALJIC No. 6.10.5) and the requirements for admissibility of a coconspirator's statements made pursuant thereto (CALJIC No. 6.24). (See *People v. Brawley* (1969) 1 Cal.3d 277, 291-292 [82 Cal.Rptr. 161, 461 P.2d 361]; *People v. Earnest* (1975) 53 Cal.App.3d 734, 744-745 [126 Cal.Rptr. 107].) The record suggests the trial court may have anticipated that the prosecutor would tender such instructions. Defense counsel never requested them, perhaps feeling they would be inconsistent with the thrust of the defense, that each murder was an isolated incident for which defendant's companions were to blame. Conspiracy instructions would not have served this defense theme well.

Assuming the court had a sua sponte duty to so instruct the jury under these circumstances, any such error was clearly harmless. (*People v. Brawley, supra*, 1 Cal.3d at pp. 291-292; *People v. Earnest, supra*, 53 Cal.App.3d at p. 745.) As noted, the facts overwhelmingly established a conspiracy to lure prostitutes and other women to defendant's warehouse to be killed, and their bodies disposed of, and further established Burns's complicity in the operation. It is not reasonably probable that the jury would have reached a

different verdict on the Oakden murder had they been instructed in the language of CALJIC Nos. 6.10.5 and 6.24.

XII. *Admission of Burns's Statements to Livingston About the Murder of Gloria Fravel*

 Burns and defendant returned to the warehouse after killing Gloria Fravel and disposing of her body; there they recounted to Livingston what they had done to Fravel. According to Burns, defendant "couldn't get [Fravel] to die" and Burns was required to choke her with a hatchet. Defendant added that Burns had gotten blood "all over the . . . place" and maintained he had to take care of everything himself. Although not disputing Burns's statements were adoptive admissions of defendant and thus admissible under an exception to the hearsay rule (Evid. Code, § 1221), defendant asserts their admission nonetheless violated his right to confrontation.

Relying on *United States v. Monks* (9th Cir. 1985) 774 F.2d 945, 952, defendant argues the prosecution was obligated to establish independent indicia of reliability for Burns's statements and failed to do so. His argument is without merit.

First, by failing to object to the admission of Burns's statements, defendant waived any error. (Evid. Code, § 353.)

Second, after *United States v. Monks* was decided, the United States Supreme Court held in *Bourjaily* v. *United States, supra*, 483 U.S. 171, that "firmly rooted" hearsay exceptions create a presumption of reliability under the confrontation clause. (483 U.S. at pp. 183-184 [97 L.Ed.2d at p. 158].) *Monks* itself acknowledges that the adoptive admission exception is so rooted (774 F.2d at p. 952). (See also *People* v. *Silva* (1988) 45 Cal.3d 604, 624 [247 Cal.Rptr. 573, 754 P.2d 1070] ["[B]y reason of the adoptive admissions rule, once the defendant has expressly or impliedly adopted the statements of another, the statements become *his own admissions*, and are admissible on that basis as a well-recognized exception to the hearsay rule."].) Thus, the prosecution was not required to establish independent indicia of reliability for Burns's statements.

Finally, assuming independent indicia were required, they were present in this case. Burns's statements were definite assertions of past facts made within hours after the described events by a person with personal knowledge. Further, they were made under circumstances suggesting reliability rather than misrepresentation; defendant himself was present and even corrected Burns's rendition of events when he deemed it appropriate—a fact

that supports the reliability of Burns's statements as defendant's admissions as well as her own. If defendant had believed that Burns's other statements were incorrect, he would most likely have offered his contrary version. Thus, there were sufficient independent indicia of reliability to satisfy even the *Monks* confrontation clause analysis. (*United States v. Monks, supra,* 774 F.2d at pp. 951-952.)

### XIII. *Defendant's Statement to Detective Morse*

■ Following his arrest, defendant gave a tape-recorded statement to Detective Sergeant Robert Morse. Before questioning defendant, Morse admonished him of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. Asked if he understood his rights, defendant, a former police officer, responded, "Yes, I do." Finding a waiver of *Miranda* rights, the court admitted defendant's statement in evidence.

Defendant challenges the finding of waiver. As he acknowledges, we have upheld such a finding under similar circumstances in *People v. Johnson* (1969) 70 Cal.2d 541, 556-558 [75 Cal.Rptr. 401, 450 P.2d 865] (disapproved on another point in *People v. DeVaughn* (1977) 18 Cal.3d 889, 899, fn. 8 [135 Cal.Rptr. 786, 558 P.2d 872]). *Johnson* remains good law on this point; the court's finding of waiver was justified by the undisputed facts, i.e., that defendant, a former police officer, was informed of his *Miranda* rights, expressly affirmed his understanding of those rights, and then proceeded to answer questions and to make statements he knew were being tape-recorded. (See *North Carolina v. Butler* (1979) 441 U.S. 369, 375-376, fn. 6 [60 L.Ed.2d 286, 293-294, 99 S.Ct. 1755]; *People v. Davis* (1981) 29 Cal.3d 814, 824-825 [176 Cal.Rptr. 521, 633 P.2d 186].) Defendant's challenge is rejected.

### XIV. *Defendant's Statement to Inspectors Schneider and Mullane*

■ After defendant was arraigned on the Searcy murder charge and counsel was appointed to represent him, Inspectors Schneider and Mullane of the San Francisco Police Department interviewed defendant in connection with the Golden Gate Park barrel murders. The record reveals the inspectors knew defendant was in custody on the Searcy charge, but did not know whether he had been arraigned or had requested or obtained counsel as to that charge. After receiving a full *Miranda* admonition, defendant waived his rights and gave a tape-recorded statement. Following a hearing at trial, the court admitted the statement.

Defendant challenges the trial court's ruling, asserting a violation of his Sixth Amendment rights under *Massiah v. United States* (1964) 377 U.S.

201 [12 L.Ed.2d 246, 84 S.Ct. 1199]. The rule of *Massiah*, however, applies to attempts to procure incriminating statements regarding the formal charges made against a defendant; a defendant has a Sixth Amendment right to counsel *only as to those charges. (People* v. *Hovey* (1988) 44 Cal.3d 543, 561 [244 Cal.Rptr. 121, 749 P.2d 776].) "Incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached are, of course, admissible at a trial of those offenses." (*Maine* v. *Moulton* (1988) 474 U.S. 159, 180, fn. 16 [88 L.Ed.2d 481, 499, 106 S.Ct. 477].) Thus, defendant's argument is effectively limited to an assertion that his uncounseled statement with respect to the barrel murders materially interfered with his right to representation on the Searcy murder charge. (*In re Michael B.* (1981) 125 Cal.App.3d 790, 796-797 [178 Cal.Rptr. 291].) On the record before us, the assertion cannot be supported.

Initially, we observe that full *Miranda* warnings were given and defendant's statement was voluntarily made after a waiver of his *Miranda* rights. Although these factors are not dispositive in a Sixth Amendment context, they are important considerations that cut against defendant's argument. (*In re Michael B., supra*, 125 Cal.App.3d at p. 795; see also *Patterson* v. *Illinois* (1989) 487 U.S. 285 [101 L.Ed.2d 261, 108 S.Ct. 2389].) Moreover, the facts of the Searcy murder are not "so inextricably enmeshed that factually and conceptually it was virtually impossible to distinguish the events." (*In re Michael B., supra*, 125 Cal.App.3d at p. 797.) Although there was unquestionably a pattern to defendant's crimes, they involved distinct events, different victims, and different times. There were differences among the offenses in material witnesses and physical evidence. Defendant does not show how, if at all, police interrogation and his statement about the barrel murders interfered with his right to counsel as to the Searcy crime. In the absence of such a showing, we reject his assignment of Sixth Amendment error.

Moreover, although defendant does not explicitly rely on Fifth Amendment grounds, we perceive no support for a Fifth Amendment argument here. As we have observed, defendant freely and voluntarily waived any Fifth Amendment right he may have had; moreover, defendant's appearance and acceptance of appointed counsel on one charge does not amount to an invocation of such rights with respect to another, uncharged offense. (*Connecticut* v. *Barrett* (1987) 479 U.S. 523 [93 L.Ed.2d 920, 107 S.Ct. 828].)

Finally, any alleged error in admitting the statement was harmless beyond a reasonable doubt. In his statement, defendant denied all knowledge of the barrel murders. Although he did make some remarks later used by the prosecutor to impeach his testimony at trial, this limited impeachment

did not play a substantial role in defendant's conviction. The testimony of other witnesses, as well as physical evidence, constituted overwhelming proof of defendant's guilt.

## XV. *Alleged Prosecutorial Misconduct at the Guilt Phase*

Defendant charges the prosecutor with several instances of misconduct in guilt phase argument to the jury. He objected to *none* of the challenged comments and so has waived any objection in those instances where the effect of the purported misconduct could have been cured by a timely admonition. (*People v. Rich* (1988) 45 Cal.3d 1036, 1087 [248 Cal.Rptr. 510, 755 P.2d 960]; *People v. Green* (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609 P.2d 468].) As shown below, each cited instance, even if misconduct, would have been cured by such an admonition. Therefore, defendant has waived his claim in this regard.

Defendant faults the prosecutor for arguing facts outside the record in several instances, including the following: "vaginal tears" are unusual for a prostitute; Michael Shing "came forward" as a witness when in fact he had been arrested before deciding to make a statement; police tested the fingerprints of over 200 people before Shing's statement; Shing testified one murder had taken place in the warehouse (he actually stated it happened in the living quarters in the warehouse building); government payments were made to Shing because his life was in jeopardy (Shing testified to fearing for his life and had told police of his fears); Livingston had testified in four preliminary hearings (the correct number was two); defendant told police he had last seen Barbara Searcy at the Sheraton Hotel (the only evidence suggested he saw her at the warehouse); and defendant said he never saw Searcy drive a Peugeot (he acknowledged seeing her drive a blue sports car, which happened to be a Peugeot). Finally, defendant claims the prosecutor falsely accused him of possessing a silencer, when in fact he testified he was merely "making" one. Each of the remarks cited represents either fair characterizations of the evidence permissible in final argument or minor misstatements of marginally relevant matters that could easily have been corrected by an objection and admonition. Whether considered individually or in the aggregate, they had no conceivable impact on the verdict and were, at most, harmless prosecutorial hyperbole.

The same can be said of defendant's further citations of misconduct, i.e., that the prosecutor vouched for the credibility of certain witnesses. Considered in context, almost all of the examples cited amounted to argument from facts in the record directed to the credibility of witnesses, not the personal statement of the prosecutor vouching for their credibility. Such argument is proper; no misconduct occurred. (*People v. Gates* (1987) 43

Cal.3d 1168, 1187-1188 [240 Cal.Rptr. 666, 743 P.2d 301].) The one personalized reference—a remark that the prosecutor had not deceived the jury and would not lie to it—was brief, innocuous, and followed immediately by references to evidence bearing on witness credibility. There was no conceivable prejudice to defendant in the remark.

Finally, defendant argues the prosecutor appealed to the passions and prejudices of the jury by suggesting, based on his analysis of the evidence and the defense argument, that defendant must think the jurors were "fools" and "buffoons." These comments came as part of the prosecutor's critical review of the defense evidence.

 We have upheld the use of "appropriate epithets warranted by the evidence." (*People* v. *Adcox* (1988) 47 Cal.3d 207, 237 [253 Cal.Rptr. 55, 763 P.2d 906] [reference to the defendant as "cold-blooded murderer" held proper].) Final argument can be "vigorous and may include opprobrious epithets reasonably warranted by the evidence." (*People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1030 [254 Cal.Rptr. 586, 766 P.2d 1] [upholding references to the defendant as "snake in the jungle," "pathological liar," and "slick"]; see also *People* v. *Terry* (1962) 57 Cal.2d 538, 561-562 [21 Cal.Rptr. 185, 370 P.2d 985] [references to the defendant as an "animal" and as "vicious" held permissible argument].) We have also held that the prosecutor may characterize a defendant's testimony as lies, so long as the inference is based on the evidence rather than the prosecutor's personal knowledge or experience. (*People* v. *Edelbacher, supra*, 47 Cal.3d at p. 1030.)

 Judged against our cases, the prosecutor's characterizations of defendant and his conduct were a permissible comment on the evidence. But, even if they were improper, any conceivable harm could have been corrected by timely objection. In any event, they were not sufficiently serious to constitute prejudicial misconduct. (*People* v. *Bloom* (1989) 48 Cal.3d 1194, 1213 [259 Cal.Rptr. 669, 774 P.2d 698]; *People* v. *Edelbacher, supra*, 47 Cal.3d at p. 1030; *People* v. *Harris, supra*, 47 Cal.3d at p. 1079.)

XVI.　*Defendant's Motion for Change of Venue*

Defendant assigns error in the trial court's denial of his motion for change of venue. In reviewing the trial court's decision, we independently examine the record to determine whether in light of the failure to change venue, it is reasonably likely that defendant in fact received a fair trial. (*People* v. *Gallego, supra*, 52 Cal.3d at p. 167; *People* v. *Williams* (1989) 48 Cal.3d 1112, 1125 [259 Cal.Rptr. 473, 774 P.2d 146].) The de novo standard of review applies to our consideration of the five relevant

factors: (1) nature and gravity of the offense; (2) nature and extent of the media coverage; (3) size of the community; (4) community status of the defendant; and (5) prominence of the victim. (*People* v. *Douglas* (1990) 50 Cal.3d 468, 495 [268 Cal.Rptr. 126, 788 P.2d 640]; *Williams, supra,* 48 Cal.3d at p. 1125.) On review of the record, we find no error in the trial court's ruling.

■■■ Although the seriousness of the offenses favors a venue change, the remaining factors are either neutral or weigh against a change. The victims were unknown prostitutes, a pimp, and a drug dealer from outside the county. (*Adcox, supra,* 47 Cal.3d at pp. 233-234.) Defendant was a resident, successful businessman, and former police officer. He was not an outsider. (*Williams, supra,* 48 Cal.3d at pp. 1129-1131.) There was no apparent racial motivation or factor in the crimes. (*Id.* at p. 1129.) Although the media attention was substantial (193 articles from 4 newspapers, 300 pages of television scripts, and 8 videotapes), coverage had dissipated several months before the venue motion. "Through the passage of time, any potential prejudice was thereby significantly reduced." (*Adcox, supra,* 47 Cal.3d at p. 232; *Douglas, supra,* 50 Cal.3d at p. 496.) In addition, San Mateo County is a large community, 11th most populous in this state, with a geographically dispersed and economically diverse population. This factor weighs against the need for a change of venue. (*People* v. *Anderson, supra,* 43 Cal.3d at p. 1131 ["The smaller the community, the greater the likelihood the accused will not get a fair trial"].)

The news coverage of the crimes, although extensive, was not particularly inflammatory. Media terms like "sexual assault," "rape," and "bullet-ridden" were fairly descriptive. References to defendant as having a "fondness" for cocaine and prostitutes were similarly restrained, as demonstrated by his own admissions and trial testimony. Further references to defendant as a "ringmaster" or "kingpin" were somewhat more exaggerated, but not so pervasive as to suggest the likelihood of prejudice in the jury panel.

A sociologist's survey of San Mateo and Sacramento County residents was introduced in evidence. The results provide little support for defendant's argument. As the expert who conducted the survey acknowledged, it was contaminated by the fact that some of the persons surveyed in the Sacramento community used for comparison had actually seen jury service and received instructions on their proper roles in evaluating evidence. Moreover, the survey showed that 63 percent of the San Mateo sample of 200 persons had heard of the case, but only 18.2 percent felt defendant was probably or definitely guilty. Of those, a total of 7.1 percent of the entire sample indicated they did not know or were not sure whether

they could follow judicial instructions. The number rose only slightly—to 7.6 percent—when more facts about the case were disclosed. Contrary to defendant's argument, we discern no substantial inference of community prejudice from these facts.

For the reasons stated above, we find no error in the trial court's denial of defendant's motion to change venue. Moreover, even if the court erred in this regard, a new trial would not be required. After independent review, including an examination of voir dire and the instructions and admonitions given to the jury, we conclude there is no reasonable likelihood that a fair and impartial jury was not impaneled. When examined on voir dire, each juror who had read something about defendant's case stated that he or she was able to ignore the extraneous information in evaluating the evidence. (*People* v. *Bean, supra*, 46 Cal.3d 919, 942-943.) No suggestion to the contrary appears in the record. Defendant was not denied a fair trial because the trial court refused a change of venue.

PENALTY PHASE ISSUES

XVII. *Defendant's Voluntary Absence From the Penalty Phase*

As the first guilty verdict was read by the clerk, defendant exploded in anger, castigating the clerk and jury members with obscenities. In the middle of his outburst, he stated: "You take me out of here and do this without me. You got it, buddy? You got it?" He walked out of the courtroom; his lawyer stipulated that his departure was voluntary.

When the penalty phase began two days later, defense counsel advised the court in defendant's presence that defendant would "continue to disrupt the proceedings and desires to absent himself from the remainder of these proceedings." Defendant affirmed on the record that he would continue to disrupt the proceedings if he remained. The court honored defendant's desire to be absent, but invited him to return to the courtroom at any time. Both defense counsel and defendant stated a video hookup with the courtroom was not desired by defendant. Before defendant left the courtroom, defense counsel promised to keep defendant advised of penalty phase proceedings so defendant could make an informed choice as to whether to return.

The penalty phase was conducted without defendant. The court advised the jury that defendant had chosen not to be present and that defendant reaffirmed his desire not to be present three additional times: during discussion of jury instructions, before final argument, and when the verdict was

returned. He did appear to make a statement at the penalty modification hearing.

■■■ Defendant argues the court violated both his right to due process under the federal Constitution and his rights under the provisions of section 1043 by allowing him to absent himself from the penalty phase. We discern no merit in defendant's argument based on either ground.

Challenging our decision in *People* v. *Robertson* (1989) 48 Cal.3d 18, 59-62 [255 Cal.Rptr. 631, 767 P.2d 1109], which allowed a capital defendant to voluntarily absent himself from both the sentence modification hearing and the imposition-of-sentence hearing, defendant maintains that a person accused of a capital crime may not waive his presence at the trial. He urges us to adopt a blanket no-waiver rule that would require a defendant to be present at all times in capital cases regardless of the defendant's conduct or expressed desires. We decline to reconsider *Robertson* or to formulate in this case any such general rule regarding a defendant's absence during penalty phase proceedings.

Here, there was no casual waiver of defendant's right to be present, uncritically accepted by the court. Defendant actually disrupted the end of the guilt phase trial, hurling obscenities at the court and jurors and demanding to be taken from the courtroom. A disruptive defendant waives his right to be present at trial. (*Illinois* v. *Allen* (1970) 397 U.S. 337 [25 L.Ed.2d 353, 90 S.Ct. 1057].) After causing the disruption and having more than ample time to "cool off," defendant solemnly expressed his intention to create further disturbances unless permitted to remain outside. He then declined several invitations to return. Under these circumstances, defendant expressly waived his constitutional right to remain in the courtroom by his own actions, taken with full knowledge and appreciation of the consequences. The court was justified in permitting defendant to remain outside, allowing him to return at any time. Defendant cites no applicable authority, here or elsewhere, requiring a contrary result. His due process rights were not infringed.

Defendant also claims a violation of section 1043, which provides a defendant shall be personally present during a felony trial (*id.*, subd. (a)), provided the trial may continue in his absence in "any case in which the defendant, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that the trial cannot be carried on with him in the courtroom." (*Id.*, subd. (b)(1).) It also allows defendants in noncapital cases to be "voluntarily absent." (*Id.*, subd. (b)(2).) However, it specifically provides for written

waivers of a defendant's right to be present given pursuant to section 977. (*Id.*, subd. (d).) Finally, it provides that a disruptive defendant may reclaim his right to be present "as soon as he is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings." (*Id.*, subd. (c).)

Defendant argues the statute was violated because he was given no warning by the court as provided in subdivision (b) of section 1043 and he merely threatened to disrupt further proceedings. We reject his hypertechnical interpretation of the statutory language. Before the penalty phase began, defendant was present in court outside the presence of the jury with his attorney. Defense counsel stated: "The record, I think, fairly clearly reflects the last time we were in session Mr. Sully absented himself from the courtroom after a disruption. I think under the—those circumstances, the terms of section 1043(b) are applicable. I have discussed this situation with Mr. Sully and I have discussed the essential content of the proceedings we are about to have. He indicates to me that he will continue to disrupt the proceedings and desires to absent himself from the remainder of these proceedings."

After defendant personally affirmed his desire to be absent, the court inquired of him as follows: "And you feel that if you were sitting here, you would continue to disrupt the proceedings as you did the last time?" Defendant responded in the affirmative. The court then stated it would honor defendant's wishes to be absent, but further emphasized: "I want you to understand—clearly understand that any time you want to come back into the courtroom, you are certainly welcome to do so. All you have to do is let your attorney know or any of the jailers, let them know, and we will start proceedings and bring you back in at any time. So you will have the right any time you want to come in."

The manifest purpose of the warning requirement in the statute is to inform a defendant of the consequences of further disruptions so as to allow him a final opportunity to correct his behavior. That purpose was satisfied here; the essential elements of the required warning were implicit in defendant's exchange with the court. Defendant was made aware that he was entitled to be present in court at any and all times, provided he did not disrupt the proceedings. A further, express warning was unnecessary in view of defendant's actual disruption of the trial and his expressed intention to do so again. Defendant was given the opportunity mandated by the statute to correct his errant behavior; he declined it. No more was required to justify his voluntary absence. Section 1043, like other provisions of law, does not require idle acts.

For the reasons stated above, defendant's absence from the penalty phase did not offend any of his constitutional or statutory rights. We reject his claim of error on this ground.

## XVIII. *Instruction Regarding Defendant's Absence*

The court informed the jury defendant was voluntarily absent from the penalty phase trial. It did not refer to his prior disruption or suggest his absence affected the proceedings in any way. Defendant claims the court should have gone further and instructed sua sponte that his absence had to be disregarded in the penalty determination; defendant did not request any such instruction.

An instruction to disregard defendant's absence would have been proper on defendant's timely request. But it does not follow that the court had a sua sponte duty to so instruct. Observing that the appearance of a shackled defendant before the jury suggests a disposition to commit violent crimes, we have held that the court must instruct sua sponte that visible restraints have no bearing on defendant's guilt. (*People v. Duran* (1976) 16 Cal.3d 282, 290-292 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1].) This case is different. No similar inference of prejudice arises when a defendant voluntarily absents himself and the jury is so informed. In this situation, nothing suggests that the defendant is incorrigibly violent or is being punished for misconduct by the court. Because the same inevitable prospect of prejudice does not exist in the case of mere absence, we decline to impose a sua sponte duty to charge the jury on the subject of absence. (See also *People v. Lewis* (1983) 144 Cal.App.3d 267, 280-281 [192 Cal.Rptr. 257].)

Finally, there was no prejudice to defendant from the lack of an instruction in this case. The jury was told defendant had voluntarily elected to be absent during the penalty phase. Defendant points to nothing in the record, whether in the prosecutor's penalty phase argument or elsewhere, suggesting that jurors were invited to draw any adverse inferences from defendant's absence. In the penalty phase instructions, the jury was told to decide defendant's case based on the evidence presented, the relevant aggravating and mitigating factors, and other pertinent provisions of law. There is no reason to believe they did otherwise.

## XIX. *Photographic Evidence of Victims' Bodies*

Defendant challenges the admission of six photographs depicting the injuries suffered by victims Fravel, Barrett, and Searcy. Contrary to his argument, the photographs did have probative value at the penalty phase to show the circumstances of the crimes. (*People v. Thompson* (1990) 50

Cal.3d 134, 182 [266 Cal.Rptr. 309, 785 P.2d 857]; *People* v. *Milner* (1988) 45 Cal.3d 227, 247 [246 Cal.Rptr. 713, 753 P.2d 669].) Their probative value was not diminished by the fact that others also participated in inflicting the injuries on the victims. The jury heard evidence of defendant's leading role in the killings. Any conflict in that evidence, including defendant's protestations of innocence, goes to weight, not admissibility, and was for the jury to resolve.

The trial court's determination that the probative value of the photographs outweighed any prejudice resulting from their admission (Evid. Code, § 352) may not be reversed except for abuse of discretion. (*People* v. *Dyer* (1988) 45 Cal.3d 26, 73 [246 Cal.Rptr. 209, 753 P.2d 1].) No such abuse is evident here. Moreover, even if the trial court erred in admitting the evidence, any error was harmless. The photographic evidence represented but a small portion of the information received by the jury regarding the offenses; the prosecutor made no attempt to exploit its presence in the record during final argument or otherwise. Defendant was not prejudiced by its consideration. (*People* v. *Turner* (1990) 50 Cal.3d 668, 706-707 [268 Cal.Rptr. 706, 789 P.2d 887].)

XX. *Failure to Instruct Regarding Exclusiveness of Aggravating Factors*

█ Defendant contends the court committed prejudicial error by failing to comply with his request to instruct the jury that the aggravating circumstances enumerated in section 190.3 were the only ones it could consider in its penalty determination. In *People* v. *Boyd* (1985) 38 Cal.3d 762 [215 Cal.Rptr. 1, 700 P.2d 782], we held that the 1978 death penalty law, "By . . . requiring the jury to decide the appropriateness of the death penalty by a process of weighing the specific factors listed in the statute, . . . necessarily implied that matters not within the statutory list are not entitled to any weight in the penalty determination." (*Id.* at p. 773.) We concluded the prosecution was not entitled to introduce evidence of the defendant's background, character, or conduct which was not probative of any listed factor.

In *People* v. *Williams, supra*, 45 Cal.3d 1268, 1324, the trial court refused a defense request for an instruction that only the statutory factors could be considered in aggravation. Although acknowledging the potential merit of the defendant's challenge to the refusal to instruct, we found no conceivable prejudice because no extraneous, nonstatutory factors were presented to the jury. (*Ibid.*) Similarly, in *People* v. *Howard* (1988) 44 Cal.3d 375, 439-442 [243 Cal.Rptr. 842, 749 P.2d 279], we found no *Boyd* error (*supra*, 38 Cal.3d 762) when the remaining instructions and the prosecutor's argument

served to focus the jury's attention on the statutory factors, and the evidence in the record was received without defense objection and was not "aggravating."

The same considerations apply here. The jury was told its penalty determination must be based on the evidence in the record considered in light of the statutory factors. As the court stated in its penalty phase charge: "In weighing the various circumstances, you simply determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death, each of you must be persuaded that the aggravating evidence is so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." The prosecutor carefully limited his final argument to an analysis of the evidence as it pertained to the listed factors. There is no basis for an inference that the jury considered anything else in its penalty decision. (See *People* v. *Howard, supra*, 44 Cal.3d at pp. 440-441.)

■ Defendant asserts the jury may have improperly considered as aggravating circumstances his outburst at the end of the guilt phase, his absence from the courtroom in the penalty phase, and his killing of the baby ducks. As to the outburst, the prosecutor did refer obliquely in final argument to defendant's "explosive disposition" and further stated, "[t]hat disposition is well evidenced by his conduct in this courtroom." But the prosecutor's statement came in the middle of a discussion concerning the circumstances of the crimes, the testimony of defendant's brother, defendant's attempts to get someone else to "take the rap" for him, and the credibility of defendant's trial testimony. In light of the entire record, this brief reference did not prejudice defendant.

As to defendant's absence, the court simply informed the jury he was voluntarily absent. Contrary to defendant's assertions, the instruction did not create any substantial probability that jurors drew any impermissible adverse inference from defendant's absence so as to require reversal of the penalty phase verdict. As to the outburst, defendant himself bears any responsibility for whatever impact it may have had on the jury.

As to the killing of the baby ducks, evidence of this incident served to explain the meaning of defendant's threat to do the same thing to his estranged wife and her daughter. The evidence was properly considered for that purpose. (*Howard, supra*, 44 Cal.3d at p. 441.)

XXI. *Instructions on the Deliberative Process*

 Defendant points to certain words and phrases in the penalty phase instructions and argues they effectively diminished the significance of the penalty determination in the minds of the jurors.

In its deliberation instructions, the court gave a modified version of CALJIC No. 8.84.2 (1986 rev.) (4th ed. pocket pt.) as follows: "It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on defendant. After having heard all the evidence and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various factors *you simply determine* under the relevant evidence which penalty is justified and appropriate by considering the totality of the mitigating circumstances. To return a judgment of death, each of you must be persuaded that the aggravating evidence is *so substantial in comparison with* the mitigating circumstances that it *warrants death* instead of life in prison without parole." (Italics added.)

Defendant finds fault with the italicized words in the instruction. Initially, he argues that use of the word "simply" serves to trivialize the jury's important task at the penalty phase. We recently rejected an identical argument in *People* v. *Cox* (1991) 53 Cal.3d 618, 679-680 [280 Cal.Rptr. 692, 809 P.2d 351]. Read in context, the word does not convey the impression that a penalty deliberation be a trivial or effortless task. The jury was told that the weighing process was not a mechanical or arbitrary one and that it was required to assign moral and sympathetic value to "all of the various factors." Thus the use of the word "simply" was innocuous surplusage; it was not misleading. (See *People* v. *Brown* (1985) 40 Cal.3d 512, 541 [220 Cal.Rptr. 637, 709 P.2d 440].)

Defendant next argues that the word "substantial" is so vague that it failed to inform jurors what they were required to find in order to impose the death penalty, and that the word "warrants" implies too low a standard for imposition of the ultimate penalty. We disagree. As we explained in *Brown, supra*: "[T]he balance is not between good and bad but between life and death. Therefore, to return a death judgment, the jury must be

persuaded that the 'bad' evidence is so substantial in comparison with the 'good' that it warrants death [rather than] life without parole." (*Brown, supra,* 40 Cal.3d at pp. 541-542, fn. 13, italics omitted.) The charge to the jury, considered as a whole, adequately conveyed to the jury the seriousness of its task and the legally appropriate manner of performing it. We reject defendant's claim of error.

Even if different words could have been chosen to describe the jury's function, the jury was not misled about its sentencing responsibilities in this case. The prosecutor nowhere suggested that the jury's task was unimportant. The closing arguments of the prosecution and the defense conveyed the magnitude of the jury's decision. As defense counsel stated in part in final argument: "The death penalty, too, is an intellectual abstraction. Gas chamber is not. If you decide for the death penalty, you should have very clearly in your minds the fact that a person is taken into a hermetically-sealed room, strapped into a chair where he is forced to breath[e] poisonous gas until he chokes to death. I say those things because the decision before you, whichever alternative you choose, cannot conceivably be an easy decision. If this is an easy decision for you, then if there be pity in this case, then I have pity for you. It should be the most difficult decision any of you has had to face in your life."

Contrary to defendant's argument, we perceive nothing in the record that would suggest the jury did not fully appreciate the seriousness and difficulty of its task.

## XXII. *Instruction on Evaluation of Mitigating Factors*

Defendant claims the court erred in failing to explain the broad range of mitigating factors the jurors could consider in reaching a penalty determination. He specifies four alleged inadequacies.

In the course of the penalty phase instructions, the court gave a so-called "catch all" mitigation instruction based in part on section 190.3, factor (k), which informed the jury to consider in its sentencing the following: "Any other circumstances which extenuate the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death whether or not related to the offense for which he is on trial. You must disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle." This instruction was sufficient to advise the jury of the full range of mitigating evidence. (See *People* v. *Easley* (1983) 34 Cal.3d 858, 878, fn. 10 [196

Cal.Rptr. 309, 671 P.2d 813]; *Blystone* v. *Pennsylvania* (1990) 494 U.S. 299, 305-306, & fn. 2 [108 L.Ed.2d 255, 263-264, 110 S.Ct. 1078, 1082-1083].)

Defendant argues the court should have instructed the jury sua sponte that it could consider any "lingering doubts" about defendant's guilt in determining penalty. Defendant had no constitutional right to such an instruction (*People* v. *Cox, supra*, 53 Cal.3d at p. 676; *Franklin* v. *Lynaugh* (1988) 487 U.S. 164, 172-174 [101 L.Ed.2d 155, 164-166, 108 S.Ct. 2320]). In addition, defense counsel was permitted to argue "lingering doubt" to the jury. The jury, in turn, was instructed to consider additional factors (such as lingering doubt) under the broad factor (k) instruction. Finally, for the reasons stated in part XXVII, *post*, this is not a case where "lingering doubt" could have played any substantial role in the penalty verdict. In sum, there was neither error nor prejudice in the court's failure to instruct the jury on "lingering doubt."

Defendant next claims the reference to "extreme" mental or emotional disturbance in the court's instruction based on section 190.3, factor (d), was improper. We have previously rejected this argument. (*People* v. *Hunter* (1989) 49 Cal.3d 957, 987-988 [264 Cal.Rptr. 367, 782 P.2d 608] ; *People* v. *Lucky* (1988) 45 Cal.3d 259, 296-297 [247 Cal.Rptr. 1, 753 P.2d 1052]; see also *Blystone* v. *Pennsylvania, supra*, 494 U.S. at p. 308 [108 L.Ed.2d at p. 265, 110 S.Ct at p. 1084.)

As defendant acknowledges, we have also rejected his arguments that: (1) the jury should have been instructed on alleged disparity in treatment of other defendants (e.g., *People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1183, fn. 26 [259 Cal.Rptr. 701, 774 P.2d 730]; *People* v. *Malone, supra*, 47 Cal.3d 1, 53-54; *People* v. *Dyer, supra*, 45 Cal.3d at pp. 69-71); and (2) the jury should have been told of its power to exercise mercy (*People* v. *Andrews, supra*, 49 Cal.3d 200). We perceive no reason to reconsider our decisions in these areas. The charge to the jury regarding sentencing factors was correct, and, together with the evidence and arguments, allowed the jurors to consider fully any and all mitigating factors.

## XXIII. *Evidence of Other Crimes*

Acknowledging our prior decisions rejecting his arguments, defendant complains of the admission of unadjudicated other-crimes evidence at the penalty phase (*People* v. *McDowell* (1988) 46 Cal.3d 551, 569 [250 Cal.Rptr. 530, 758 P.2d 1060]; *People* v. *Howard, supra*, 44 Cal.3d at pp. 425-426) and specifically complains that the statute of limitations had run with respect to one such crime: making threatening phone calls to defendant's estranged spouse (*People* v. *Robertson, supra*, 48 Cal.3d at p. 43; *People* v. *Jennings*

(1988) 46 Cal.3d 963, 981-982 [251 Cal.Rptr. 278, 760 P.2d 475]). For the reasons stated in those decisions, we reject defendant's arguments.

XXIV. *Instructions on the Consideration of Other-crimes Evidence*

■ Defendant contends the court had a sua sponte obligation: (1) to instruct the jury that Michael Shing was an accomplice in the rape of Monica Tafoya at the warehouse (an incident the prosecutor asserted to be another crime committed by defendant); and (2) to qualify CALJIC No. 2.27, which instructs that the testimony of one witness is sufficient to prove any fact, to require corroboration of Shing's testimony. Shing did not testify at the penalty phase, but he did testify at the guilt phase about the Tafoya rape, as did Tafoya herself.

The court gave a general set of accomplice instructions at the guilt phase. At the penalty phase, the jury was twice informed to consider the instructions as a whole. Under these circumstances, there was no error in failing to repeat verbatim the accomplice instructions.

Moreover, there was no conceivable prejudice to defendant in any failure to give accomplice instructions with respect to Shing. Shing's testimony was fully corroborated by Tafoya's testimony as well as by physical evidence found at the warehouse. Although defendant denied raping Tafoya, the evidence left virtually no doubt that he did so. His cause would not have been aided by repetition of accomplice instructions at the penalty phase.

The court edited CALJIC No. 2.20 to delete its reference to felony convictions as a factor to be considered in assessing credibility because none of the penalty phase witnesses had been convicted of a felony. Defendant assigns error, claiming that Shing and Livingston, both of whom testified to other crimes committed by defendant at the guilt phase, had prior felony convictions. The jury was told to consider the instructions as a whole; we assume the jurors continued to follow the version of the instruction given at the guilt phase as to the testimony of witnesses who testified there. (*People v. Williams, supra*, 45 Cal.3d at p. 1321; *People v. Gates, supra*, 43 Cal.3d at p. 1209.) Even if they did not, defendant waived any error by failing to resist the modification of the instruction. (*People v. McLain* (1988) 46 Cal.3d 97, 113 [249 Cal.Rptr. 630, 757 P.2d 569]; *People v. Miranda, supra*, 44 Cal.3d at p. 99.)

Finally, defendant faults the court for failing to instruct the jury sua sponte that jurors were required to agree unanimously that defendant committed the other crimes alleged by the prosecution. As defendant concedes,

no such sua sponte instruction is required by our decisions. (*People* v. *Carrera, supra,* 49 Cal.3d 291, 342; *People* v. *Ghent* (1987) 43 Cal.3d 739, 773-774 [239 Cal.Rptr. 82, 739 P.2d 1250].) We decline defendant's invitation to reconsider them.

## XXV. *Miscellaneous Penalty Phase Instructions*

 Defendant maintains the court erred in refusing to instruct that the factor of age in former CALJIC No. 8.84.1 (§ 190.3, factor (i)) is a mitigating factor only. The prosecutor argued that defendant, at age 39, should have known better than to do what he did. As defendant acknowledges, we have previously rejected similar contentions. (*People* v. *Lucky, supra,* 45 Cal.3d at pp. 301-303; *People* v. *Andrews, supra,* 49 Cal.3d at pp. 232-233.) We therefore reject his claim.

We have likewise rejected defendant's argument that a burden-of-proof instruction is required at the penalty phase. (*Andrews, supra,* 49 Cal.3d at p. 232; *Allen, supra,* 42 Cal.3d at p. 1285.)

Finally, we have held, contrary to defendant's argument, that the court has no duty to excise assertedly inapplicable aggravating and mitigating factors from the statutory list of sentencing factors. (*People* v. *Lewis* (1990) 50 Cal.3d 262, 280-281 [266 Cal.Rptr. 834, 786 P.2d 892]; *People* v. *Miranda, supra,* 44 Cal.3d at pp. 104-105.) We decline to reconsider these holdings.

## XXVI. *Alleged Prosecutorial Misconduct in Final Argument*

 Defendant claims several instances of misconduct in the prosecutor's final argument. We reject his claims.

As with the prosecutor's final argument at the guilt phase, defendant failed to object at trial to any of the alleged instances of misconduct he now asserts. As shown below, a timely objection and admonition would have cured any alleged misconduct in this case. Therefore, defendant's claim is waived. (*People* v. *Rich, supra,* 45 Cal.3d at p. 1087; *People* v. *Green, supra,* 27 Cal.3d at p. 28.)

But even in the absence of waiver, defendant's claims of misconduct fail. Initially, defendant faults the prosecutor for attempting to use defendant's cocaine addiction as an aggravating factor. The prosecutor argued that defendant was not impaired by the use of cocaine, that he functioned well during his use of it, and that, "if anything, the cocaine effectively enhanced this desire to abuse people, sexually abuse them and ultimately kill them."

The prosecutor's argument was supported by testimony from a defense expert who acknowledged that cocaine users like defendant remain fully aware of their conduct. It was also supported by testimony from defendant himself, who acknowledged that he considered himself a "sex fiend" while freebasing and that he "liked to be with prostitutes and do dope. Chase women and do dope." Thus, the prosecutor was pointing to a connection between cocaine and defendant's sexual desires that defendant himself admitted. Nor did the prosecutor's remarks turn cocaine addiction into an aggravating factor. Considered in context, the prosecutor was merely arguing that factor (h) in section 190.3 (impairment as a result of intoxication) did not apply in this case.

Defendant also asserts the prosecutor relied on nonstatutory aggravating factors in his argument, including defendant's: (1) lack of remorse and conscience as shown by the manner of the killings; (2) "explosive disposition" as manifested by the testimony of his brother, his conduct in the courtroom, and other evidence of violence; and (3) established penchant for violence, as "a disservice to others" in society. We detect no prejudice to defendant in these remarks. The references to lack of remorse and conscience were part of a factual discussion of the circumstances of defendant's crimes, an aggravating factor. (§ 190.3, factor (a).) Defendant's conduct in the courtroom was but one example of his "explosive disposition"; the record contained abundant evidence of past violence from which an inference of future violence could properly be drawn. There was neither misconduct nor prejudice in these remarks. (*People* v. *Carrera, supra*, 49 Cal.3d at p. 339; *People* v. *Adcox, supra*, 47 Cal.3d at pp. 258-259; *People* v. *McDowell, supra*, 46 Cal.3d at p. 571.)

In addition, defendant charges the prosecutor with misconduct in pointing to defendant's activities in fashioning a silencer and in arguing that defendant "would have continued to kill absent his arrest." The evidence supports the prosecutor's argument on both counts. Defendant had procured a pamphlet on silencers. He conceded on the stand at the guilt phase that he had ground down the sight on his gun as part of an "experiment" involving the manufacture of a silencer. Moreover, the number and pattern of defendant's crimes permitted an inference that similar conduct could be expected in the future. No misconduct occurred.

Finally, defendant alleges the prosecutor made unfounded derogatory remarks about him, referring to the facts of his crimes and calling him a "human monster" and a "mutation." There was no misconduct in the prosecutor's remarks. As we have observed in connection with the guilt phase argument (pt. XV, *ante*), the use of these kinds of terms can constitute permissible comment regarding egregious conduct on defendant's part.

That was the case here. Even if the use of these characterizations could be viewed as misconduct, defendant suffered no prejudice. An objection and admonition would have cured any error; defendant made no objection. Moreover, the prosecutor's exaggerated expressions were brief and isolated instances, and emanated from the heinous details of defendant's crimes and defendant's own statements about his conduct. (*People* v. *Bloom, supra,* 48 Cal.3d 1194, 1213; *People* v. *Hovey, supra,* 44 Cal.3d at pp. 979-980.)

XXVII. *Guilt and Penalty Phase Error and the Rule of Harmless Error*

Defendant claims the cumulative impact of the guilt and penalty phase errors deprived him of his Eighth Amendment right to a reliable penalty determination. We have rejected each of defendant's assignments of guilt and penalty phase error or have found such errors waived or harmless. We discern no cumulative impact of these harmless errors sufficient to justify reversal. (*People* v. *Johnson, supra,* 47 Cal.3d at 1241.)

Contrary to defendant's assertions, we have reviewed the record in this case and find each of the assignments of error and misconduct at the guilt and penalty phases, even if assumed to be meritorious, to be harmless; with respect to any alleged errors of constitutional dimension, we find they were harmless beyond a reasonable doubt. Defendant's conviction of the crimes with which he was charged rests firmly on a foundation of physical evidence that connects each of the crimes to defendant and his warehouse. His purported explanations for these connections were inconsistent with each other and the incontrovertible evidence. His history of vicious crimes was vividly described by numerous witnesses and revealed by overwhelming corroborative evidence. Even if defendant had received an error-free trial, there is no reasonable prospect the guilt or penalty verdicts would have been different. (*United States* v. *Hasting* (1983) 461 U.S. 499, 507-512 [76 L.Ed.2d 96, 105-108, 103 S.Ct. 1974]; *Chapman* v. *California* (1967) 386 U.S. 18, 23-24 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

XXVIII. *The Automatic Motion for Modification of the Death Verdict*

■ Defendant asserts the court did not comply with statutory requirements in ruling on the automatic motion for modification of the death verdict. (§ 190.4, subd. (e).) He maintains the trial judge failed to consider applicable mitigating factors and improperly considered a probation report. We reject both of defendant's assertions.

Defendant argues the court made no mention of the mitigating fact of the absence of prior felony convictions or the testimony of his friends and

employees as to his general character. He submits the court erred in stating there were no factors in mitigation. Defendant ignores the context of the court's remarks. It expressly stated at the outset it had considered *all* statutory aggravating and mitigating factors; it also stated it had considered the testimony of the defense witnesses at the penalty phase. Thus, the court did not fail to consider defense evidence or mitigating factors such as defendant's prior felony record; it simply found such factors to be insufficient to vitiate the jury's penalty determination. Such a finding was not only proper, it was amply justified by the record in this case. (*People* v. *Williams, supra*, 45 Cal.3d at p. 1330.)

Defendant also maintains the court violated the rule of *People* v. *Lewis, supra*, 50 Cal.3d at page 287, by considering the probation report *before* it ruled on the automatic motion for modification of sentence. He asserts he was prejudiced by the report because it describes the impact of his crimes on the parents of Barbara Searcy and Kathryn Barrett. The record does not clearly show that the court reviewed or considered the probation report as part of the automatic modification motion. At the conclusion of its ruling on the motion, the court expressly stated its ruling was based on "all of the evidence" without any reference to the probation report. Only thereafter (and just before pronouncing sentence) did the court mention having considered the probation report.

Assuming the court did read the report before formulating its ruling on the modification motion, we perceive no prejudice to defendant. In contrast to the situation in *Lewis,* the court here did not refer to the report or to the so-called victim impact information the report contains in the course of its ruling. (50 Cal.3d at p. 287.) Nor does defendant show that any information contained in the report conceivably influenced the court's ruling. In the absence of any contrary indication in the record, we will assume the trial judge was able to put aside extraneous information in the report. Defendant's claim is rejected. (*People* v. *Douglas, supra*, 50 Cal.3d at pp. 539-540.)

## XXIX. *Constitutionality of the 1978 Death Penalty Law*

Finally, defendant maintains the 1978 death penalty statute is unconstitutional because it does not require: (1) written findings as to the aggravating factors found by the jury; (2) proof beyond a reasonable doubt of the aggravating factors; (3) jury unanimity on the aggravating factors; (4) a finding that aggravating factors outweigh mitigating factors beyond a reasonable doubt; (5) a finding that death is the appropriate punishment beyond a reasonable doubt; and (6) a "procedure to enable the reviewing court to evaluate meaningfully the sentencer's decision." Although defendant

does not so acknowledge, we have rejected each of these contentions in past decisions. (E.g., *People* v. *Rodriguez, supra,* 42 Cal.3d at pp. 777-778; *People* v. *Gates, supra,* 43 Cal.3d at pp. 1188-1190, 1201; *People* v. *Allen, supra,* 42 Cal.3d at p. 1285; *People* v. *Malone, supra,* 47 Cal.3d at p. 60; *People* v. *Jackson* (1980) 28 Cal.3d 264, 316-317 [168 Cal.Rptr. 603, 618 P.2d 149]; *People* v. *Brown, supra,* 46 Cal.3d at pp. 461-462; *People* v. *Williams* (1988) 44 Cal.3d 883, 960 [245 Cal.Rptr. 336, 751 P.2d 395]; *People* v. *Bell* (1989) 49 Cal.3d 502, 553 [262 Cal.Rptr. 1, 778 P.2d 129]; see also *Lowenfield* v. *Phelps* (1988) 484 U.S. 231, 245-246 [98 L.Ed.2d 568, 582, 108 S.Ct. 546]; *Pulley* v. *Harris* (1984) 465 U.S. 37, 39 & fn. 1, 51-55 [79 L.Ed.2d 29, 33, 40-44, 104 S.Ct. 871].)

In addition to the briefs filed by defendant's appointed counsel on appeal, defendant himself has filed several briefs in propria persona. We have considered the issues and arguments raised in each of the briefs and discern in them no basis to reverse or modify either the guilt or penalty phase determinations or the judgment of death. Where appropriate, we have discussed the additional issues and arguments raised in the briefs filed in propria persona during the course of our discussion of the principal assignments of error outlined above.

The remaining matters in the briefs authored by defendant do not merit extended discussion or consideration. For example, defendant maintains the prosecution made improper use of his invocation of his right to remain silent by introducing parts of his tape-recorded statements in which he had refused to answer questions, and by commenting on his responses in final argument. Initially, defendant does not point to any objection to the prosecutor's conduct. As a result, his arguments are deemed waived. (Evid. Code, § 353.) In addition, the record reveals that defendant voluntarily consented to interrogation and then selectively refused to answer certain questions on grounds that, e.g., he was not a stool pigeon or he was unwilling to put his foot in his mouth. In closing argument, the prosecutor commented on inconsistencies between defendant's pretrial statements and his trial testimony.

A defendant cannot consent to be interrogated and then select the portions of the interrogation that will be used at his trial. The record does not reveal that any admission made by defendant *after* he had invoked *Miranda* rights was admitted at his trial. Defendant does not demonstrate that his constitutional or other legal rights were in any way violated in this case. (*People* v. *Silva, supra,* 45 Cal.3d at pp. 629-630.) Whether or not expressly discussed, we have considered and rejected as without merit all of the assignments of error presented in all of defendant's briefs.

## DISPOSITION

For the reasons stated above, we find no reversible error in the record. The judgment of death is affirmed.

Broussard, J., Panelli, J., Kennard, J., Arabian, J., and Baxter, J., concurred.

**MOSK, J.,** Concurring.—I concur in the judgment. After review, I have found no error warranting reversal.

I write separately because I am troubled by the majority's treatment of defendant's contention that the trial court erred by denying his motion for change of venue.

To be sure, in the past our opinions have at times been somewhat ambiguous on the proper method of analysis for such a claim on appeal, appearing to conflate the logically separate questions of whether error was committed and, if so, whether reversal is required. (See, e.g., *People v. Williams* (1989) 48 Cal.3d 1112, 1125-1126 [259 Cal.Rptr. 473, 774 P.2d 146]; *People v. Adcox* (1988) 47 Cal.3d 207, 231 [253 Cal.Rptr. 55, 763 P.2d 906]; *People v. Balderas* (1985) 41 Cal.3d 144, 177 [222 Cal.Rptr. 184, 711 P.2d 480]; *People v. Harris* (1981) 28 Cal.3d 935, 948-949 [171 Cal.Rptr. 679, 623 P.2d 240] (plur. opn.).) Now, however, the principles are clear. (See *People v. Douglas* (1990) 50 Cal.3d 468, 541-542 [268 Cal.Rptr. 126, 788 P.2d 640] (conc. opn. of Mosk, J.); *People v. Cooper* (1991) 53 Cal.3d 771, 805-806 [281 Cal.Rptr. 90, 809 P.2d 865].)

Penal Code section 1033 provides in relevant part that "the court shall order a change of venue," "[o]n motion of the defendant, to another county when it appears that there is a reasonable likelihood that a fair and impartial trial cannot be had in the county." (*Id.*, subd. (a).)

As I explained in my concurring opinion in *People v. Douglas, supra,* 50 Cal.3d 468, "When a defendant claims on appeal that a ruling denying a change-of-venue motion was erroneous, the first question, obviously, concerns whether the ruling was in fact such. The relevant inquiry is: Was there a reasonable likelihood that a fair and impartial trial *could not be had* in the county? This inquiry, of course, focuses on the ruling itself and the record on which it was made. It does not look to subsequent matters, such as the voir dire of prospective jurors.

"The second question—which must be resolved if error is found—concerns whether reversal is required. The relevant inquiry then becomes: Is

there a reasonable likelihood that a fair and impartial trial *was not in fact had* in the county? This inquiry may consider pertinent matters subsequent to the challenged ruling. Only if the answer is affirmative must reversal be ordered." (*People* v. *Douglas, supra,* 50 Cal.3d at p. 542, italics in original (conc. opn. of Mosk, J.); accord, *People* v. *Cooper, supra,* 53 Cal.3d at pp. 805-806.)

The crucial phrase "reasonable likelihood" "means something less than 'more probable than not[,]' " but "something more than merely 'possible.' " (*People* v. *Bonin* (1988) 46 Cal.3d 659, 673 [250 Cal.Rptr. 687, 758 P.2d 1217].)

On appeal, a ruling denying a change-of-venue motion is subject to independent review. (See generally *People* v. *Bonin, supra,* 46 Cal.3d at pp. 676-677.) Plainly, the reasonable likelihood *vel non* of a fair and impartial trial is a mixed question of law and fact; moreover, the issue is predominantly legal and also implicates constitutional rights. The determination of such a question is scrutinized de novo. (E.g., *People* v. *Louis* (1986) 42 Cal.3d 969, 987 [232 Cal.Rptr. 110, 728 P.2d 180].)

In this case, I have some doubts about the majority's conclusion that the trial court's denial of defendant's change-of-venue motion was not erroneous. After independent review, it appears at least arguable that at the time of the ruling, there was indeed a reasonable likelihood that a fair and impartial trial could not be obtained in the county. Indeed, at the hearing a sociological expert gave testimony, based on a survey he had conducted, that suggested that about 20 percent of the prospective jurors would have to be excused for cause for actual bias. Although the majority do not acknowledge the fact, the survey was commissioned *by the People* and the expert testified *on their behalf.*

But even if the trial court did indeed err, I do not believe that reversal is required. There was not a reasonable likelihood that a fair and impartial trial was not in fact obtained. Certainly, the voir dire of the prospective jurors who were subsequently sworn to try the case supports only one conclusion, viz., that they were indeed fair and impartial. Defendant does not—and cannot—claim otherwise.

Accordingly, having found no prejudicial error in the trial court's denial of defendant's motion for change of venue or in any other matter, I concur in the judgment.

Appellant's petition for a rehearing was denied September 25, 1991, and the opinion was modified to read as printed above.