Filed 5/9/14  P. v. Mays CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DEMORIA JAMES MAYS,<br><br>    Defendant and Appellant. | A138057<br><br>(San Francisco City and County<br>Super. Ct. No. 218794) |

On September 10, 2012, police responded to a San Francisco residence where the resident, Hakiti Moala, stated that her boyfriend, Demoria James Mays, who was inside, had choked her.  The police arrested Mays, and found packets of methamphetamine and a bag of bullets in his pockets.  A handgun was later found in the residence and Moala stated that the gun belonged to Mays.

Mays was charged with six felony counts.  A jury found Mays not guilty on one count, guilty of a lesser included misdemeanor offense on another count, and guilty on the remaining counts.  The trial court sentenced Mays to an aggregate term of five years and 10 months in state prison.

On appeal Mays asserts three errors:  (1) that prosecutorial misconduct during closing argument prejudiced the jury's consideration of his case; (2) the trial court erred in admitting evidence of prior incidents, pursuant to Evidence Code section 1101, subdivision (b); and (3) the court erred by instructing the jury with CALCRIM No. 375.

1

Although we agree that prosecutorial misconduct occurred, we conclude that the misconduct was harmless in this case. We find no merit in Mays's remaining arguments and affirm the judgment of the trial court.

## BACKGROUND

### I. *Procedural Background*

On December 5, 2012, the People filed a first amended information charging Mays with assault by means of force likely to cause great bodily injury (Pen. Code, § 245, subd. (a)(4)),[1] count 1; false imprisonment (§ 236), count 2; possession of a controlled substance, methamphetamine, for sale (Health & Saf. Code, § 11378), count 3; possession of a firearm with a prior conviction (§ 29900, subd. (a)(1)), count 4; possession of a firearm by a felon (§ 29800, subd. (a)(1)), count 5; and possession of ammunition while prohibited from possessing a firearm (§ 30305, subd. (a)(1)), count 6. The information also alleged two prior serious felony convictions, pursuant to sections 667, subdivisions (d) and (e), and 1170.12, subdivisions (b) and (c), and two prior convictions, pursuant to section 667, subdivision (a)(1).

A jury found Mays guilty on counts 3, 4, 5 and 6; not guilty on count 2; and guilty of the lesser included offense of simple assault (§ 240) on count 1. In a bifurcated proceeding, the court found true the prior conviction allegations.

On March 1, 2013, the court sentenced Mays to an aggregate term of five years and 10 months in state prison: four years on count 6; two years on count 4, to be served concurrently; 16 months on count 3, to be served consecutively; and 6 months on count 1, to be served consecutively.

Mays filed a timely notice of appeal on March 5, 2013.

### II. *Factual Background*

### A. *The Events of September 10, 2012*

On September 10, 2012, about 9:45 p.m., San Francisco Police Officers Chad Campos and Brian Burke were on patrol in the Sunnydale area in the Ingleside district.

---

[1] Further unspecified code sections refer to the Penal Code.

The officers received a dispatch call directing them to 70 Blythedale because "somebody had received a text from somebody saying please respond to this particular address, and that they needed police assistance." When they arrived, Campos knocked on the door and a female, later identified as Moala, who appeared to be crying with a swollen face, opened the door. Campos had Moala step outside and she told him that her boyfriend, Mays, was inside.

Campos stepped inside and saw Mays sitting on a couch. Campos identified himself as a police officer and asked Mays if he had any weapons. Mays said he did not. Campos then heard Moala tell Burke, "He choked me," after which Campos placed Mays under arrest and handcuffed him. Campos searched Mays and found 11 baggies of suspected methamphetamine and a ziplock bag containing 9-millimeter bullets. Later, at the police station, Campos tested the suspected drugs and obtained a positive result for methamphetamine.

Additional police officers also arrived at the scene—Officers Quintero, Zahid Khan, Roel Dilag and Sergeant Rodney Chan. Chan observed that Moala was crying and trembling. She had visible redness about her face and upper neck.

After Mays had been taken to a police car, Chan began to photograph the scene and observed a closet with a lock that had damaged hinges. Chan opened the closet door to ensure that no one was hiding inside it and observed the grip of a firearm on the top shelf. The firearm was a loaded 9-millimeter handgun. Chan asked Moala who owned the firearm and her first response was that it belonged to her. Chan then asked her why she had a firearm in her closet and Moala responded, "Okay, it wasn't mine, it's his."

Khan noted that when he arrived, Moala was emotionally distraught and had bruising and red marking on her face, but he observed that Mays had no apparent injuries. Moala told Khan that Mays had come to her house about 5:00 p.m. Two days previously, Moala had learned that she was pregnant. After both drank some beer and wine, Moala told Mays about her pregnancy. Mays became belligerent and hit Moala several times in the face with his hand. Moala ran to the back door, but Mays grabbed her from behind and pulled her to the ground. Mays positioned himself on top, put his hands around her

3

neck, and began to choke her. Moala believed that she lost consciousness and she feared for her life. Moala urinated in her pants and Mays got up and kicked her in the head. At some point, Mays took Moala's cell phone away from her.

Moala told Khan that Mays grabbed her and pulled her to the upper level of her residence. Mays told her to fill the tub and she did so.[2] Moala then entered the tub to wash off the urine. When Moala left the bathroom, Mays returned her cell phone. Moala sent a text message to a friend asking the friend to call the police. She did not call the police herself because she was afraid that Mays would use his firearm against her. Moala then deleted the message from her phone so that Mays would not see it. Moala went downstairs and talked with Mays to keep him calm until the police arrived.

San Francisco Fire Department Paramedic Ashley Jardine responded to check on Moala. Moala told Jardine that she was six weeks pregnant and that Mays had choked her and punched her in the face. Jardine noted that Moala had bruising and swelling over the bridge of her nose. She had an abrasion on the left side of her neck that was consistent with choking. Moala was "very withdrawn, talking very quietly, she seemed to be visibly upset, her hands were shaking. She would cry off and on."

Penny Ritter, a criminalist at the Alameda County Sheriff's Office crime lab, testified as an expert in the identification and testing of controlled substances. Ritter tested the contents of the 11 baggies found when Mays was searched and determined that each contained methamphetamine.

San Francisco Police Officer Michael Moody testified as an expert in the possession of methamphetamine for sale. Moody testified that methamphetamine is usually sold in clear white ziplock baggies. It was Moody's opinion that the 11 baggies were possessed for sale because in his experience only dealers, and not users, had such a large amount of methamphetamine.

---

[2] While at the scene, Khan observed that there was water in the bathtub and the bathroom floor was wet.

4

**B.** *Prior Uncharged Acts*

On October 10, 2009, Richard Chaput, a deputy sheriff with the San Mateo County Sheriff's Office, performed a search of Mays and his apartment in San Carlos, California for firearms. Before performing the search, Chaput had observed a vehicle registered to Mays parked about a block and a half from the apartment. Mays denied owning a vehicle, stating that he had sold his car. However, keys found in Mays's pocket fit the vehicle that Chaput had observed earlier. Chaput searched the vehicle and found a fully loaded .32-caliber revolver wrapped in a towel in the engine compartment of the car.

On January 19, 2003, San Francisco Police Officer Derrick Johnson and other officers went to an apartment to apprehend Mays for possession of a firearm. Johnson saw Mays standing in a bedroom and placed him under arrest. Mays had .22-caliber bullets in a jacket pocket. Johnson found a cocked and loaded .22-caliber semiautomatic pistol underneath a dresser in the bedroom. The female owner of the apartment was not arrested and stated that she was not aware of firearms in the apartment.

**C.** *The Defense Case*

Jamila Reed lives next door to Moala. During the summer of 2012, after Reed's son and Moala's son were found together with their pants down, Moala broke Reed's window with a chair and yelled, "Bitch, come outside." Reed opened the door and Moala hit her with a closed fist on the shoulder. The two women fought, wrestling and throwing punches. After the fight, Moala slapped Reed's son. Reed grabbed Moala by the hair, they fell to the floor, and fought again.

On January 22, 2010, South San Francisco Police Officer Wilfredo Herrera responded to a call at 316 Alida Way. During the call, Herrera encountered Moala. Herrera told Moala that he would have to arrest a friend of hers who was intoxicated outside the apartment building. Moala pulled her friend into an apartment, told the police that her friend was now inside and could not be arrested, and attempted to shut the door. Herrera and other officers entered the apartment and arrested Moala's friend. Moala

5

became belligerent, waving her arms and yelling profanities, and officers had to hold her down in a chair. When asked for her name, Moala initially provided a false name.

Mays testified that prior to the events of September 10, 2012, he had known Moala for about four months and they had been in a relationship for about three months. On September 10, Moala had called Mays and he agreed to meet her at her residence after work. Moala had told Mays she was pregnant about two weeks before. Mays arrived about 5:15 p.m. and Moala was drinking a beer. Moala left to buy more beer and five to ten minutes later Mays heard a commotion behind the apartment. He heard Moala yelling and when he went outside he found her in an altercation with another woman. Mays walked toward the women and observed that Moala was angry, her face was red, and her hair was "messed up."

Later that evening, a neighbor named John, whom Mays suspected to be a drug user, came to Moala's residence. Moala and John talked at the back door, John left, and Mays then could not find Moala anywhere. Mays called Moala's phone and she said she had gone to a neighbor who was sick to give her tea, but Mays suspected that she was using drugs. When Moala returned, her eyes were wide and red and she "looked wired." Moala went upstairs to dress so she and Mays could go to a movie and Mays searched her jacket. In her jacket, Mays found the drugs that had been presented as evidence, and on her dresser he found a bag of bullets in a ziplock bag. Mays confronted Moala and she became angry. They cussed at each other, but the argument never became physical. Mays denied threatening, hitting, or choking Moala. Mays did not return the drugs or the ammunition to Moala, intending to throw them away. Mays was not aware that there was a gun in the closet.

It was stipulated by the parties that Mays had three prior section 29900 felony convictions in 2005 and 2006.

## DISCUSSION

### I. *Prosecutorial Misconduct*

Mays maintains that we must reverse because during rebuttal closing argument the prosecutor stated that the presumption of innocence is a "legal fiction" that "gets stripped

away the minute you walk into that jury room and you start to deliberate." Mays believes that this comment prejudicially contributed to the verdicts reached by the jury.

## A. *Background*

During rebuttal closing argument, the prosecutor stated: "The legal fiction that we employ here when we say someone is presumed innocent, he is—" Defense counsel immediately objected and the court corrected the prosecutor: "It's a legal standard."

The prosecutor then continued, without objection: "It's a legal standard. He is not innocent. He is presumed innocent, and that legal presumption gets stripped away the minute you walk into that jury room and you start to deliberate, and you start adding up all of the evidence against him, and unanswered questions about what happened in this case, unless they go to an element of one of the counts, does not mean that he is innocent[.] It does not mean that he is not guilty just because you can't answer certain questions that you may have about the case."

In his motion for a new trial, Mays noted that defense counsel had objected to the statement that the presumption of innocence is a "legal fiction,"[3] but pursued another part of the rebuttal closing argument as a ground for a new trial: "In the district attorney's closing argument she referred to the [p]resumption of [i]nnocence as a 'legal fiction.' Although the objection by the defense was sustained, the district attorney went on to say that the defense had failed to call [certain witnesses] to corroborate his story." Mays characterized these comments as burden shifting. At the hearing on the new trial motion, defense counsel stated: "But in terms of the misconduct issue, I did want to emphasize that where the lack of corroboration deals with witnesses who are not material evidence or not really logical witnesses to call, that's what the misconduct rule focuses on, and I think none of the witnesses cited by the prosecution in closing argument really constitute material evidence or logical witnesses, and that again tied in with the presumption of

---

[3] We are disappointed that a prosecutor who, according to State Bar of California records, has been an active member of the bar since 1985, would refer to the presumption of innocence as a legal fiction.

7

innocence and characterizing it as a legal fiction I think goes beyond any of the cases cited by the prosecution . . . ."

The court denied Mays's motion for a new trial. Before denying the motion, the court stated: "The only issue about which I had some concern was the issue of burden shifting in the closing argument. I went back and read the record on that to make sure that my memory of it was correct, and, as the defense has noted, I agreed with the defense position that the statement that the presumption of innocence is a 'legal fiction' is incorrect. I immediately corrected that statement by saying 'it is a legal standard,' and [the prosecutor] immediately adopted that correction and repeated what I said and said 'it is a legal standard.' So to the extent that there was any unclarity with regard to that issue, it was immediately corrected, and I do not find any evidence for any prosecutorial misconduct in this case with regard to presentation of evidence, the opening statement and closing argument . . . ."

**B. *The Issue of Forfeiture***

"To preserve a claim of prosecutorial misconduct during argument, a defendant must contemporaneously object and seek a jury admonition." (*People v Bonilla* (2007) 41 Cal.4th 313, 336.) Mays did not object to the prosecutor's statement that the presumption of innocence is stripped away when the jury begins its deliberation. Nevertheless, Mays now maintains that we should consider whether that statement was prejudicial prosecutorial misconduct.

Mays asserts that "defense counsel made a timely objection to preserve the issue." However, defense counsel objected only to the characterization of the presumption of innocence as a "legal fiction," and made no objection to the statement that the presumption is stripped away when the jury begins its deliberation. Mays states that a further objection would have been futile "given the trial judge's interjection, 'It's a legal standard' [citation] and subsequent view that the court corrected the error.' " (See *People v. Boyette* (2002) 29 Cal.4th 381, 432 [a defendant will be excused from the necessity of timely objecting and/or requesting an admonition if either would be futile].) To the contrary, the court demonstrated its willingness to correct the mischaracterization of the

8

presumption of innocence as a legal fiction and we have no reason to believe that the court would not have corrected other errors in argument, had an objection been made.

Mays also argues that his "new trial motion grounded on the prosecution's violation of his presumption of innocence which was denied [citation] sufficed to preserve the issue for appeal." Neither in the new trial motion nor in the hearing that addressed it was the comment that the presumption of innocence is stripped away when the jury begins deliberation mentioned.

Mays notes that we have the power to reach the issue despite waiver. "An appellate court is generally not prohibited from reaching a question that has not been preserved for review by a party." (*People v. Williams* (1998) 17 Cal.4th 148, 161-162, fn. 6.) We agree with Mays that we *may* consider the issue, but Mays does not support his argument with reasons why we *should* consider the issue if it is otherwise forfeited. Nevertheless, we *do* exercise our discretion to consider the comment because it was clearly contrary to the law. The issue of burden shifting that was raised in the new trial motion is not included in Mays's arguments on appeal and we do not address it.

## C. *The Prosecutor's Misconduct was Harmless*

"[I]t is misconduct for a prosecutor, during argument, to misstate the law." (*People v. Whalen* (2013) 56 Cal.4th 1, 77.) Here, it was misconduct for the prosecutor to refer to the presumption of innocence as a "legal fiction." "The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." (*Estelle v. Williams* (1976) 425 U.S. 501, 503.) It was also misconduct for the prosecutor to tell the jury that the presumption of innocence is stripped away when the jury begins its deliberation. "The presumption of innocence ends with the judgment . . . ." (*People v. Taylor* (1963) 218 Cal.App.2d 321, 324; see also *U.S. v. Perlaza* (9th Cir. 2006) 439 F.3d 1149, 1172 ["the presumption of innocence 'go[es] with the jury when it deliberates' "].)

When the prosecutor referred to the presumption of innocence as a "legal fiction," defense counsel promptly objected and the court immediately, in the presence of the jury, said, "It's a legal standard." While this was not a formal admonishment to the jury, it

9

was a firm correction of the prosecutor's misstatement and that correction was immediately adopted by the prosecutor. Defense counsel did not request a formal admonishment, nor do we have reason to believe that a formal admonishment would have had greater effect on the jury, given the directness with which the court corrected the prosecutor.

Mays argues that the "trial court's curative instruction was flawed because it did not specify that the presumption of innocence goes with the jury when it deliberates, after the prosecutor improperly argued that the presumption is stripped away when you start deliberating." However, the objection and the court's correction were made before the prosecutor continued and stated that the presumption is stripped away at the start of deliberation.

Mays also argues that the presumption of innocence "is much more than a mere legal standard." That is true, but it does not mean that it is wrong to describe the presumption of innocence as a legal standard. When a court instructs the jury, the court informs the jury what the relevant law is, and does not usually discuss whether a legal principle derives from the federal Constitution, the state Constitution, statutes, or the common law.

Because the court's correction served as an admonishment, we presume that the misconduct involved in the "legal fiction" statement was cured. (See *People v. Wash* (1993) 6 Cal.4th 215, 263 ["[w]e presume that the jury heeded the admonition and any error was cured].) Nothing in the record serves to rebut the presumption that the court's correction of the prosecutor cured the prosecutor's misstatement.

The prosecutor's misstatement that the presumption of innocence is stripped away when the jury begins deliberation was made without objection and without an admonition by the trial court. However, the court instructed the jury with CALCRIM No. 103: "I will now explain the presumption of innocence and the People's burden of proof. . . . [¶] . . . [¶] A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. . . . [¶] In deciding whether the People have proved their case beyond a reasonable doubt, you must

10

impartially compare and consider all the evidence that was received throughout the entire trial.  Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty."  That the jury found Mays not guilty on one count and guilty of a lesser included offense on another count clearly shows that the jury properly accorded Mays a presumption of innocence and performed its role as instructed.  Accordingly, while misconduct occurred that was not corrected by a court admonition, we conclude that in this case the misconduct was harmless, under any standard of prejudice.

## II.  *Prior Conduct Evidence*

Mays contends that the trial court erred by ruling that, pursuant to Evidence Code section 1101, subdivision (b), the People could present evidence concerning guns allegedly in his possession in 2003 and 2009.  We conclude that the trial court did not abuse its discretion in admitting the challenged evidence.

### A.  *Legal Standard*

Evidence Code section 1101 provides, in relevant part:  "(a)  Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.  [¶]  (b)  Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

"The admissibility of other-crimes evidence depends on three principal factors: (1) the materiality of the fact sought to be proved or disproved; (2) the tendency of the uncharged crime to prove or disprove the material fact; and (3) the existence of any rule

or policy requiring the exclusion of relevant evidence, e.g., Evidence Code section 352."[4] (*People v. Sully* (1991) 53 Cal.3d 1195, 1224.)

We review a trial court's ruling under Evidence Code section 1101 for abuse of discretion. (*People v. Rogers* (2006) 39 Cal.4th 826, 862.) "We will reverse only if the court's ruling was 'arbitrary, whimsical or capricious as a matter of law.' " (*People v. Branch* (2001) 91 Cal.App.4th 274, 282.)

## B. *Background*

Prior to trial, the People submitted a motion in limine seeking to admit into evidence five prior incidents of alleged gun use or possession by Mays, including the 2009 incident already described in which a gun was hidden in the engine block of a car registered to Mays, but which Mays maintained he had sold (the 2009 incident). Mays submitted a motion in limine to exclude prior incidents, including one that the People had not included—the 2003 incident in which a gun was found underneath a dresser in the room in which Mays was arrested, Mays having bullets of the same caliber as the gun in his pocket (the 2003 incident). The People later gave notice that they sought to introduce evidence concerning the 2003 incident.

In considering the 2009 incident, the court stated: "[W]hile I recognize that putting a loaded gun allegedly in the closet of your girlfriend has certain differences to putting the gun in a towel in the engine of a car that you claim you no longer own, which in fact you have the keys to, while they're not that similar in terms of the manner in which the gun is secreted, I do think that there is sufficient evidence of a common plan or scheme to secrete a gun, and that under [an Evidence Code section] 352 analysis I have to find that there is evidence of a common design or plan, and I do think there is, and then the question is whether or not the evidence is sufficiently independent of the evidence in this case. . . . [¶] . . . I think that on balance under [Evidence Code section] 352, given

---

[4] Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

the burden that the People have and the probative effect as compared to the prejudicial effect of admitting this particular incident, I do think that [Evidence Code section] 352 argues for admitting the October 2009 [incident]. I have to consider whether it's remote. It's not. . . . If we look at that conduct, in and of itself it's not cumulative. Admitting that would not be cumulative of anything else, and it does show a common design or plan to secrete a gun." The court also determined that the 2009 incident would be admissible to show motive and knowledge. In order to protect Mays from prejudicial effect, the court stated that the People would not be allowed to present evidence that Mays had been charged in the 2009 incident but had not yet gone to trial. The court observed that "having tried unsuccessfully to hide a gun in a car that he owned would explain his motive for now trying to hide a gun in . . . someone else's residence to further separate himself from the ownership of the gun, ownership or possession of which was prohibited by virtue of his prior felony conviction." The court concluded that the People could submit evidence concerning the 2009 incident. The court did not allow the People to admit evidence concerning the other prior incidents detailed in their motion in limine.

The court later considered the 2003 incident and ruled that evidence concerning it would be similarly admissible pursuant to Evidence Code section 1101, subdivision (b), and was not unduly prejudicial.

## C. *The Court did not Abuse Its Discretion*

The record shows that the court carefully considered whether the incidents that the People sought to admit into evidence at trial were admissible under Evidence Code section 1101, subdivision (b), or inadmissible under Evidence Code section 1101, subdivision (a). The court disallowed most of the incidents about which the People sought to introduce evidence.

In both the 2003 and 2009 incidents, like the charged incident, a gun was hidden in a place from which Mays could attempt to dissociate himself. In the 2009 incident, the gun was found in a vehicle registered to Mays, but Mays attempted to dissociate himself from the vehicle by claiming that he had sold it, despite still having keys to the vehicle. In 2003, a gun was hidden underneath a dresser in the room in which Mays was arrested,

13

and Mays possessed a bag of bullets of the same caliber as the gun. The 2003 incident is particularly similar to the charged incident, in which a gun was found in a closet in the dwelling in which Mays was arrested, and Mays possessed a bag of bullets of the same caliber as the gun. Both the 2003 and 2009 incidents are probative, tending to prove that Mays employs a common plan to hide a gun in a location such that he can claim the gun belongs to someone else. Accordingly, the evidence was admissible under Evidence Code section 1101, subdivision (b), at the very least, to show a common plan.

Neither the 2003 nor 2009 incidents were unduly prejudicial. " ' "Prejudice" as contemplated by [Evidence Code] section 352 is not so sweeping as to include any evidence the opponent finds inconvenient. Evidence is not prejudicial, as that term is used in [an Evidence Code] section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of *undue* prejudice . . . . " 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging." ' " ' " (*People v. Branch*, *supra*, 91 Cal.App.4th at p. 286.) Here, neither incident required the presentation of facts, such as actual use of the gun, that were more egregious than the conduct with which Mays was charged and, thus, the incidents would not tend to uniquely evoke an emotional bias against Mays.[5]

The court instructed the jury with CALCRIM No. 375,[6] in relevant part: "If you decide that the defendant committed the acts, you may, but are not required to, consider

---

[5] Mays also contends that admission of the Evidence Code section 1101, subdivision (b), evidence violated his due process rights. However, this contention depends on our having found the evidence to be unduly prejudicial, and we have not.

[6] Mays contends that it was error for the court to instruct the jury with CALCRIM No. 375. This contention is dependent on Mays's argument that "the prior, uncharged 2009 and 2003 offenses were not admissible to prove that defendant had a plan or scheme to commit other offenses alleged in this case." Because we conclude that the prior offenses *were* admissible, Mays's argument fails.

14

that evidence for the limited purpose of deciding whether or not the defendant had a plan or scheme to commit the offenses alleged in this case.  [¶]  In evaluating this evidence, consider the similarity or lack of similarity between the acts and the charged offenses. Do not consider this evidence for any other purpose.  Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime."  The court's instructions minimized any danger that the jury might rely upon the 2003 and 2009 incidents for an improper purpose.  (See *People v. Barnett* (1998) 17 Cal.4th 1044, 1119.)

We find no abuse of discretion by the trial court when it admitted evidence concerning the 2003 and 2009 incidents, pursuant to Evidence Code section 1101, subdivision (b).

## DISPOSITION

The judgment is affirmed.

_____
Brick, J.*


We concur:


_____
Kline, P.J.


_____
Richman, J.


\* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.